PEOPLE v BUDZYN

PEOPLE v NEVERS

Docket Nos. 102654, 102655. Argued November 12, 1996 (Calendar Nos. 1-
2). Decided July 31, 1997.

Detroit Police Officers Walter Budzyn and Larry Nevers were con-
victed following a joint trial before separate juries in the Detroit
Recorder's Court, George W. Crockett III, J., of the second-degree
murder of Malice Green during an attempted arrest. The Court of
Appeals, WAHLS, P.J., and CAVANAGH and N. J. LAMBROS, JJ., affirmed
in an unpublished opinion per curiam (Docket Nos. 170477,
170478). The defendants appeal.

In an opinion by Justice RILEY, joined by Justices BRICKLEY,
CAVANAGH, and WEAVER, the Supreme Court *held*:

The defendants have demonstrated that their juries were
exposed to extrinsic influences that created a real and substantial
possibility of prejudice depriving them of their constitutional rights
under the Sixth Amendment. These errors, however, were harmless
beyond a reasonable doubt with regard to defendant Larry Nevers.
Therefore, the conviction of defendant Nevers is affirmed. With
regard to defendant Walter Budzyn, the extrinsic influences were
not harmless beyond a reasonable doubt. Accordingly, defendant
Budzyn's conviction is vacated and the case is remanded for a new
trial.

1. During deliberations, jurors may consider only the evidence
that is presented to them in open court. Consideration of extrane-
ous facts not introduced in evidence deprives a defendant of the
rights of confrontation, cross-examination, and assistance of coun-
sel embodied in the Sixth Amendment. In order to establish that
extrinsic influence was error requiring reversal, the defendant must
initially prove that the jury was exposed to extraneous influences,
and that these extraneous influences created a real and substantial
possibility that they could have affected the jury's verdict. Gener-
ally, in proving the second point, the defendant will demonstrate
that the extraneous influence is substantially related to a material
aspect of the case and that there is a direct connection between
the extrinsic material and the adverse verdict. If the defendant
meets this initial burden, the burden shifts to the people to demon-

strate that the error was harmless beyond a reasonable doubt. The people may do so by proving either that the extraneous influence was duplicative of evidence produced at trial or that the evidence of guilt was overwhelming.

2. Generally, jurors may not impeach their own verdict by subsequent affidavits showing misconduct in the jury room. Once a jury has been polled and discharged, its members may not challenge mistakes or misconduct inherent in the verdict. Rather, oral testimony or affidavits only may be received with regard to extraneous or outside errors, such as undue influence by outside parties. The distinction between an external influence and inherent misconduct is not based on the location of the wrong. Rather, the nature of the allegation determines whether the allegation is intrinsic to the jury's deliberative process or whether it is an outside or extraneous influence. In examining these affidavits, a trial court should not investigate their subjective content, but should limit its factual inquiry to determining the extent to which the jurors saw or discussed the extrinsic evidence.

3. In these cases, three influences culled from sworn affidavits were extraneous to the trial proceedings and did not result exclusively from juror misconduct inherent in the verdict. According to these sworn statements, the juries were exposed to, and considered during deliberations, extraneous factors regarding whether defendants Budzyn and Nevers were guilty of second-degree murder. Each defendant has met his initial burden. These extraneous influences were harmless with respect to defendant Nevers, however, in light of the overwhelming evidence of his guilt. But the errors require reversal of defendant Budzyn's conviction because the evidence against him was not overwhelming.

Justice BOYLE, concurring in part and dissenting in part, stated that with respect to *Budzyn*, it is a fundamental presumption of the judicial system that all Americans are equally capable of fairly discharging their public responsibilities. The judiciary has no competence to assess the cultural or psychological mind-set of a given jury and assess its reactions in light of its own assumptions. Further, the showing of the movie, *Malcolm X*, to the jurors was not an extraneous communication, and juror knowledge of contingency plans in the event the verdict was an acquittal, although discussed during deliberations, standing alone, would not require reversal.

However, the communication of incorrect information to the jurors during deliberations that defendant Budzyn was a member of STRESS was error requiring reversal. Evaluated in the context of the evidence as a whole, the prejudicial significance is that Budzyn's membership in STRESS indicated a propensity for abuse of young

black males. Coupled with other evidence admitted at trial, this information could have persuaded the jurors that Budzyn had a man-endangering state of mind. Not only was this evidence relevant to besmirching the defendant's character, but it also supported the prosecution's theory that the defendant was guilty of second-degree murder. Because there was substantial and real prejudice, the error was not harmless beyond a reasonable doubt.

*People v Budzyn* reversed and remanded for a new trial.

*People v Nevers* affirmed.

Chief Justice MALLETT, concurring in part and dissenting in part, stated that the defendants received a fair trial. While the potential for prejudice from the asserted influences is real, it does not rise to a real and substantial possibility that the verdicts were affected. Given the overwhelming evidence supporting the verdicts, it can be said beyond a reasonable doubt that the influences did not contribute to the verdicts.

Once a defendant comes forward with evidence establishing the existence of an extraneous prejudicial influence, the burden shifts to the government to rebut the presumption of prejudice by showing that the extraneous influence was harmless error. To determine whether the extraneous influences merit reversal, reviewing courts must first determine whether the defendant has made the required threshold showing that the extraneous materials were prejudicial and must then examine whether the prosecution has shown that the jury's exposure to the materials was harmless. Exposure to prejudicial extrinsic materials is harmless error if the reviewing court may conclude, beyond a reasonable doubt, that the other evidence adduced at trial is so overwhelming that there is no real and substantial possibility that the challenged evidence contributed to the conviction.

Given the unique facts of this case, the defendants failed to meet the threshold burden of establishing a real and substantial possibility that the viewing of the movie *Malcolm X* affected the verdicts. Even if the defendants had met their initial burden, a reversal is not required here because it can be said beyond a reasonable doubt that the other evidence adduced at trial was so overwhelming that there is no real and substantial possibility that viewing the movie might have contributed to the convictions.

The defendants did not produce sufficient evidence that either jury panel, in its entirety, was tainted by exposure to media reports concerning contingency plans of suburban law enforcement in case of postverdict rioting. While the exposure occurred during deliberations, the lack of proof regarding the degree of juror exposure weighs against a new trial. Even if extensive juror exposure had

been shown, it could not be concluded that there was a real and substantial possibility that the exposure affected the verdict. The reports did not relate directly to a material aspect of the case and were not material to the defendants' guilt or innocence. Finally, even if the defendants' met their burden of showing prejudice, a new trial would not be warranted because of the overwhelming evidence against them.

No combination of factors, including other asserted extraneous influences, denied the defendants a fair trial by an impartial jury. Given the overwhelming evidence supporting the verdicts, those influences did not substantially sway the judgment of the jurors.

Justice KELLY took no part in the decision of this case.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *John D. O'Hair*, Prosecuting Attorney, *Timothy A. Baughman*, Chief, Research, Training and Appeals, and *Olga Agnello*, Assistant Prosecuting Attorney, for the people.

*Carole M. Stanyar* for defendant Budzyn.

*Neil H. Fink* for defendant Nevers.

Amicus Curiae:

*William J. Johnson*, pro hac vice, and *Frank A. Guido*, General Counsel for Police Officers Association of Michigan, for National Association of Police Organizations, Inc.

RILEY, J. In this appeal, we are asked to review the fairness of the trial for two police officers who were convicted of second-degree murder for killing a suspected drug user while attempting to arrest him while the suspect was holding contraband. We conclude that defendants have demonstrated that their juries were exposed to extrinsic influences that created a real and substantial possibility of prejudice, depriving them of their constitutional rights under the Sixth Amendment. These errors, however, were harmless

beyond a reasonable doubt with regard to defendant Larry Nevers. Therefore, we affirm defendant Nevers' conviction. With regard to defendant Walter Budzyn, we conclude that the extrinsic influences were not harmless beyond a reasonable doubt. Accordingly, we vacate defendant Budzyn's conviction and remand for a new trial.

### FACTS AND PROCEEDINGS

Defendants Budzyn and Nevers were police officers with the Detroit Police Department. They were on duty when the incident occurred that resulted in Malice Green's death. Both were tried at a single criminal proceeding with two different juries.[1]

On November 5, 1992, at approximately 10:15 P.M., defendants were patrolling in the city of Detroit in plain clothes in an unmarked vehicle. They apparently observed a Tempo, driven by Malice Green, with bullet holes in its front passenger door. Defendant Nevers, who only gave testimony before his own jury, testified that he observed the car pull up in front of a house known for its drug activity. Budzyn and Nevers stopped behind the Tempo to investigate. The home, with a storefront attached to it, was occupied by Ralph Fletcher. Fletcher explained that others used his house for illegal drug activities. Robert Hollins and Theresa Pace, witnesses to the event, were present at Fletcher's house and had been smoking cocaine that evening.

Defendant Budzyn, who only testified before his own jury, said that he witnessed Robert Knox running

---

[1] There were charges that their crime was racially motivated. Consequently, we note that Budzyn and Nevers are white and Malice Green is black.

along the building and explained that he chased Knox because, apparently by mistake, he believed that Knox had been in the vehicle with Green.[2] Budzyn caught Knox, brought him around to the front of Fletcher's place, and patted him down for weapons. He also patted down Fletcher, who had been in the car with Green. Manuel Brown, who had been smoking cocaine at Fletcher's place, was walking away from the house, but stopped to watch this activity. Nevers asked Malice Green for his driver's license. Green did not respond to Nevers' request, but walked around to the passenger side of his vehicle and got in. Green was sitting in the passenger seat, with his legs hanging out the open doorway. Budzyn came around to the passenger side, shined his flashlight on him, and asked for his license. Green began to look in the glove compartment, grasped at something that was on the floor, apparently cocaine, and Budzyn asked him to let go of what was in his hand.

At this point, there is substantial disagreement in the testimony given by defendants Budzyn and Nevers and the witnesses to the incident, Brown, Fletcher, Hollins, Knox, and Pace regarding what happened.

The five civilian witnesses testified that after Green refused to open his hand, Budzyn began to hit him repeatedly on the hand with the police flashlight, telling him to open his hand. Budzyn then climbed onto Green, who did not resist but did not comply, straddling him. Brown testified that Budzyn struck Green about ten times on his head with the flashlight.

---

[2] Budzyn was apparently mistaken because Fletcher was the only passenger in the Tempo with Green; Knox had traveled to Fletcher's place with Hollins at approximately 7:00 P.M. that evening. Knox had paid Hollins $15 (in cash and cocaine) to drop him off at the house.

Fletcher, who was only three to five feet away, testified that Budzyn repeatedly hit Green on the hand. Hollins said that he heard Budzyn hit Green six or seven times, and, although he did not see the blows land, that these blows must have landed on Green's head. Knox said that he saw Budzyn hit Green in the hand because Green did not open it when Budzyn asked.[3] Pace testified that from the position on which Budzyn sat on Green, he must have been hitting him on the head.

These five witnesses also said that, while Budzyn was struggling with Green in the Tempo, Nevers struck Green on his knee several times. Brown and Fletcher said that Nevers then went around to the other side of the car, the driver's side, opened the door, and struck Green, who was now lying on the front seat, on the head with his flashlight.[4] Nevers instructed these people to leave the scene.

In contrast to this testimony, Budzyn explained to his jury that while Green was sitting in the passenger side of the vehicle, he suspected that Green was holding narcotics in his fist. He said that he grabbed Green's right arm and that Green kicked him with both his legs. He produced evidence of a small injury to his knee. Budzyn said that he turned and fell backward into the vehicle, dropping his flashlight. Budzyn denied that he ever hit Green at all. Budzyn also said that he only held Green's hands because he suspected that he was holding narcotics. Budzyn called for backup assistance. Budzyn explained that he heard

[3] Knox's testimony from the preliminary examination was read to the jury because Knox died before trial.

[4] Fletcher said he saw Nevers land two blows to Green's head with a golf-like swing.

"two hits" after Nevers went around to the driver's door and said that he later was "shocked" to find so much blood on the scene. Budzyn said he retrieved four rocks of cocaine from inside the vehicle.

Like Budzyn, Nevers testified to his jury that he assisted Budzyn when Green resisted Budzyn's efforts to open his hand. Nevers explained that he only hit Green on his knees when Green brought his knees up to stop Nevers from prying open his hand. Nevers then went to the other side of the vehicle because Budzyn told him that Green was attempting to get out of the other side of the car. Nevers then told the people from Fletcher's place to leave. Nevers explained that he hit Green in the head with his flashlight because Green was grabbing for his gun. Nevers said that after he struck him, "[Green] finally let go of my gun and I did not hit him [again]" at that time. Nevers flagged down the EMS medical technicians who had been called to the scene. Green continued to struggle with the officers and Nevers said he saw something "shiny" in Green's right hand and he struck him again, the blow landing on Green's head, because Nevers feared he might be carrying a razor blade or knife. Nevers admitted that, during the course of the inci- dent he hit Green five or six times on the head with his flashlight.

The EMS medical technicians arrived in two vehicles. The first to arrive were Albino Martinez and Mithyim Lewis. The other EMS vehicle soon arrived with two other medical technicians, Lee Hardy and Scott Walsh. Several marked police cars arrived soon after the EMS vehicles. Martinez, Lewis, Hardy, and Walsh all testified that Green was covered with blood and was hanging from the driver's side door when

they arrived. There was a pool of blood under his head on the street. These witnesses said that Nevers struck Green in the head with his heavy police flashlight repeatedly even though Green was not offering any significant resistance. Martinez and Walsh said that Nevers told Green to open his hands and hold still, and that, when he did not, Nevers hit him with the flashlight. Martinez and Lewis said that Nevers hit Green four times in the head with the flashlight, while Hardy said he saw Nevers hit Green approximately ten times in the head. Martinez explained that Green was "dazed," and Hardy described him as "stuporous," relating that Green was uttering only a few words like "wait" while Nevers was striking him.

Officer Robert Lessnau,[5] who arrived on the scene in one of the marked police vehicles, pulled Green from the vehicle. The EMS medical technicians testified that Lessnau hit Green with his fists. Martinez and Walsh said that while Lessnau was striking Green, Nevers also hit Green twice in the ribs. Green finally released the car keys he held in one hand and a piece of white paper, apparently for rolling rock cocaine, he held in the other. The uniformed officers, including Sergeant Freddie Douglas,[6] then cuffed Green's hands behind his back as Green struggled. The EMS medical technicians began rendering care to Green. Green suffered a seizure and, soon after, died.

The people presented Dr. Kalil Jiraki, an assistant Wayne County Medical Examiner, as a medical expert

---

[5] Officer Lessnau was charged with assault with intent to murder. He was tried at the same time as Budzyn and Nevers in a bench trial. The trial court acquitted him.

[6] Sergeant Douglas was charged with a crime but the magistrate dismissed the charge at his preliminary examination.

to testify regarding the nature of Green's wounds and the cause of his death. Dr. Jiraki testified that Green died from "[b]lunt force trauma to [his] head" and that he suffered at least fourteen blows to the head. Dr. Jiraki also explained that Green had 0.5 micrograms of cocaine in his body, indicating that he was under the influence of cocaine at the time of his death. He concluded, however, that it had "no bearing on the cause of his death." In response, defendants presented three pathologists, one of whom, Dr. L. G. Dragovic, testified that he identified eleven blunt-force injuries to Green's head.

Budzyn and Nevers were charged with second-degree murder. Beginning with the first reports of Green's death, the case produced a firestorm of media publicity in the Detroit metropolitan area. The incident occurred soon after the California state courts acquitted four white Los Angeles police officers who had been videotaped beating black motorist Rodney King. The acquittal in the King case resulted in a terrible riot in Los Angeles that drew the attention of the national media. The media reports in Detroit of Green's death included a comparison of the two incidents. Before the trial began, the Detroit Police Department fired defendants. The city of Detroit also agreed to a multimillion dollar settlement with Green's estate. In response to some criticisms of the settlement, a city attorney stated that a generous settlement might spare the city the riotous violence that racked Los Angeles after the acquittal of the police officers. These events occurred during the interval between Green's death in November 1992 and the start of defendants' trial in June 1993, seven months later.

Defendants moved to sever the trials, and the trial court refused to separate the proceedings, but did grant defendants separate juries. Nevers asked for a change of venue because of the extensive pretrial publicity, but the trial court denied this motion. The trial court began the voir dire on June 2, 1993. The people began presenting their case on June 18, 1993. During a recess near the end of trial, on August 5 and 6, 1993, the trial court provided the juries with several film videos to watch to entertain themselves, including a copy of *Malcolm X*. The film begins with a video of the Los Angeles police officers beating Rodney King. Defendants moved for a mistrial on this basis, but this motion was denied.[7]

After approximately seven weeks of trial, the juries began deliberating on August 13, 1993. Budzyn and Nevers were convicted of second-degree murder. The jury in Budzyn's trial deliberated for eight days, and, in Nevers' trial, the jury deliberated for nine days. Budzyn was sentenced to serve eight to eighteen years, and Nevers was sentenced to twelve to twenty-five years in prison. Defendants moved for a new trial, but the trial court denied this motion.

On appeal by right, the Court of Appeals consolidated defendants' appeals and affirmed the convictions in an unpublished opinion per curiam, issued March 22, 1995 (Docket Nos. 170477, 170478). Defendants appealed to this Court, and this Court

---

[7] The trial judge did not select the movies or approve the selections himself, but he took responsibility for the action taken by the employees of the court. The trial judge disqualified himself on ruling on defendants' motion. The chief judge of Recorder's Court referred the motion to a third judge who heard the motion and denied it.

granted leave.[8] In reviewing the many claims of error raised on appeal, we have only provided an analysis of the claim regarding the extrinsic influences on the jury. For the remaining claims, we believe that the Court of Appeals has properly responded to these claims and we affirm its decisions with regard to them.[9]

### ANALYSIS

#### I. THE STANDARD FOR CLAIM OF ERROR FOR EXTRINSIC INFLUENCES ON THE JURY

A defendant tried by jury has a right to a fair and impartial jury. *People v Tyburski*, 445 Mich 606, 618; 518 NW2d 441 (1994) (MALLETT, J., plurality opinion), citing *Duncan v Louisiana*, 391 US 145; 88 S Ct 1444; 20 L Ed 2d 491 (1968). During their deliberations, jurors may only consider the evidence that is presented to them in open court. See *United States v Navarro-Garcia*, 926 F2d 818, 820 (CA 9, 1991). Where the jury considers extraneous facts not introduced in evidence, this deprives a defendant of his rights of confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment. See *Hughes v Borg*, 898 F2d 695, 700 (CA 9, 1990).

In order to establish that the extrinsic influence was error requiring reversal, the defendant must initially prove two points. First, the defendant must prove that the jury was exposed to extraneous influ-

---

[8] 451 Mich 884 (1996).

[9] We note that one claim of error was conceded by defendants on appeal to this Court. Defendants acknowledge that their claim regarding an instructional error was resolved by this Court's decision in *People v Tims*, 449 Mich 83, 99; 534 NW2d 675 (1995), in which we held that a defendant may be convicted of a crime if his culpable conduct was "a" proximate cause of death.

ences. See *Marino v Vasquez*, 812 F2d 499, 504 (CA 9, 1987). See also *United States v Caro-Quintero*, 769 F Supp 1564, 1573 (CD Cal, 1991). Second, the defendant must establish that these extraneous influences created a real and substantial possibility that they could have affected the jury's verdict. See *Hughes, supra* at 700.[10] Generally, in proving this second point, the defendant will demonstrate that the extraneous influence is substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict. See *Caro-Quintero, supra* at 1574, citing *United States v Bagnariol*, 665 F2d 877, 885 (CA 9, 1981).[11] If the defendant establishes this initial burden, the burden shifts to the people to demonstrate that the error was harmless beyond a reasonable doubt. We examine the error to determine if it is harmless beyond a reasonable doubt because the error is constitutional in nature. See *People v Anderson (After Remand)*, 446 Mich 392, 406; 521 NW2d 538 (1994). The people may do so by proving that either the extraneous influence was duplicative of evi-

---

[10] The inquiry whether the extrinsic influences could have affected the jury's verdict is an objective inquiry. See *Dickson v Sullivan*, 849 F2d 403, 406 (CA 9, 1988).

[11] This Court may also consider the following factors in determining whether the extrinsic influence created a real and substantial possibility of prejudice:

> (1) whether the material was actually received, and if so how; (2) the length of time it was available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict. [*Marino, supra* at 506.]

dence produced at trial or the evidence of guilt was overwhelming. See *Hughes, supra* at 700.

## II. APPLICATION OF THE STANDARD

### A. EXPOSURE TO EXTRINSIC EVIDENCE

In examining the extraneous influences that defendants claim affected the juries' verdicts, we shall focus on defendants' claims from juror affidavits that the juries were exposed to (1) the film *Malcolm X,* (2) media reports during the trial of existing contingency plans in case of rioting, i.e., placing the National Guard on alert and closing the freeways in the event the juries acquitted, and (3) the claim that the jurors considered as a factor defendants' supposed participation in the police unit known as STRESS (Stop the Robberies Enjoy Safe Streets)[12] even though there was no evidence about this produced at trial. There is no dispute that the trial court provided the film *Malcolm X* to the juries, which they watched (at least in part) on August 5, 1993, and on August 6, 1993.[13] This viewing occurred near the end of trial: the trial had begun on June 18, 1993, and the juries began deliberating on August 13, 1993. The affidavits confirmed that the jurors had watched, at least in part, *Malcolm X.* Defendants also rely on these juror affidavits to assert that the two other alleged extrane-

---

[12] STRESS was a controversial decoy unit of the Detroit Police Department that gained a reputation for brutality. A juror from the Nevers trial stated that "[i]t was explained during deliberations that STRESS was a police group that *regularly abused young black males in the city.*" (Emphasis added.) Defendant Nevers was apparently previously a member of this unit, while defendant Budzyn apparently was not previously a member.

[13] Before this date, on August 2, 1993, the trial court had informed the juries that they would have to be in their jury rooms on August 5, 1993, and August 6, 1993, even though there would be no court-related activity.

ous influences listed above affected the juries' verdicts.

Generally, jurors may not impeach their own verdict by subsequent affidavits showing misconduct in the jury room. *People v Pizzino*, 313 Mich 97, 108; 20 NW2d 824 (1945). See also *Tanner v United States*, 483 US 107; 107 S Ct 2739; 97 L Ed 2d 90 (1987). As the Court of Appeals has previously noted, once a jury has been polled and discharged, its members may not challenge mistakes or misconduct inherent in the verdict. Rather, oral testimony or affidavits may only be received on extraneous or outside errors, such as undue influence by outside parties. See *Hoffman v Monroe Public Schools*, 96 Mich App 256, 257-258; 292 NW2d 542 (1980), citing *Mattox v United States*, 146 US 140; 13 S Ct 50; 36 L Ed 917 (1892). See also *People v Larry Smith*, 106 Mich App 203, 211-212; 307 NW2d 441 (1981). As the United States Supreme Court has explained, the distinction between an external influence and inherent misconduct is not based on the location of the wrong, e.g., distinguished on the basis whether the "irregularity" occurred inside or outside the jury room. Rather, the nature of the allegation determines whether the allegation is intrinsic to the jury's deliberative process or whether it is an outside or extraneous influence. See *Tanner*, *supra* at 117-118. In examining these affidavits, a trial court should not investigate their subjective content, but limit its factual inquiry to determining the extent to which the jurors saw or discussed the extrinsic evidence. See *Dickson v Sullivan*, 849 F2d 403, 406 (CA 9, 1988).

After reviewing the three sworn juror affidavits,[14] we believe that we may consider these affidavits to determine whether they met the threshold requirement. The three influences culled from the sworn affidavits, as identified above, were extraneous to the trial proceedings and did not result exclusively from juror misconduct inherent in the verdict. According to these sworn statements, the juries were exposed to, and considered during deliberations, extraneous factors regarding whether defendants Budzyn and Nevers were guilty of second-degree murder.

B. REAL AND SUBSTANTIAL POSSIBILITY OF PREJUDICE

We must next determine whether defendants have established that there is a real and substantial possibility that these extrinsic influences could have affected the juries' verdict. When considering that (1) the juries viewed the film *Malcolm X* as a group near the end of trial, (2) the juries, or a member, were exposed during deliberations to the fact the city of Detroit was bracing for a riot in the event of an acquittal, and (3) the juries were exposed to extrinsic

---

[14] Defendants together produced four affidavits from jurors who sat during trial, three from defendant Nevers' trial and one from defendant Budzyn's trial. The trial court refused to grant an evidentiary hearing regarding these affidavits, but instead accepted the statements as true regarding what occurred before and during deliberations.

One of the affidavits that defendant Nevers relies on was not signed by the juror. We have not considered this affidavit. Defendant Nevers attempted to remedy the deficiency by producing an affidavit from an attorney who swore that the particular juror had verbally adopted all of the statements, but only refused to sign the affidavit because she feared that it would bring "renewed pressure to her from the media and from the public." However, the attorney cannot testify with respect to these juror's statements because that testimony would be hearsay. Hence, the attorney's affidavit has not cured this fundamental defect. Consequently, for this appeal, there are only three sworn juror affidavits that we may consider.

information, in part inaccurate, that defendants were previously members of the STRESS police unit, we believe that each defendant has established his initial burden.

The first of these influences that we address is the *Malcolm X* film. The film is a work based on Malcolm X's autobiography. The juries viewed the film with the understanding that it had been provided, with three others, as entertainment by the trial court during a period late in trial where there were no trial proceedings. The film begins with the voice of Malcolm X's character giving a provocative speech charging "the white man with being the greatest murderer on earth" while the viewer is shown footage of Rodney King being beaten by Los Angeles police officers, interspersed with a picture of an American flag.[15] The Rodney King videotape is shown in slow motion, in eight

---

[15] The character of Malcolm X gives a voice-over narrative at the beginning of the film:

> Brothers and sisters, I am here to tell you that I charge the white man, I charge the white man with being the greatest murderer on earth. I charge the white man with being the greatest kidnapper on earth.
>
> There is no place in this world that man can go and say he created peace and harmony. Everywhere he's gone he's created havoc. Everywhere he's gone he's created destruction. So I charge him, I charge him with being the greatest kidnapper on this earth. I charge him with being the greatest murderer on this earth. I charge him with being the greatest robber and enslaver on this earth. I charge the white man with being the greatest swine eater on this earth, the greatest drunkard on this earth. He can't deny the charges. You can't deny the charges. We're the living proof of those charges. You and I are the proof. You're not an American. You are a victim of America.
>
> You didn't have a choice coming over here. He didn't say "black man, black woman, come on over and help me build America." He said "nigger get down in the bottom of that boat and I'm taking you over there to help me build America." Being born here does not make you an American. I'm not an American. You're not an Ameri-

segments, as the American flag begins to burn. *Id.* The voice-over makes an explicit reference to the city of Detroit, the location of the incident in the instant case, by stating that the black community has been deprived of democracy in the "streets of Detroit." *Id.* The factual similarities between (1) Rodney King's assault by police officers in Los Angeles as captured by the video shown at the beginning of *Malcolm X* and (2) the police brutality inflicted against Malice Green in Detroit, as charged, are striking. The parallel is unmistakable.[16]

Later, in a different scene of the film, the character portraying Malcolm X states:

> No, I'm telling you that devil has made dead souls out of you and I [sic]. . . . Why, my brothers and sisters, he should get down on his knees. He should beg our mercy. Oh, my brothers and sisters, his kind has committed God's greatest crime against your and my kind every day of his life. He ought to get on his knees and say he's committed the crime. But does he do that? Does he do that? No. No, he scorns you. *He splits your head with his night stick, he busts you upside of the head with that billy club,* he calls you a nigger. I'm telling you he calls you a coon. That's what he says to you—"Boy," "Nigger." Four hundred years

---

can. You're one of the twenty-two million black people who are the victims of America.

* * *

. . . We didn't see any democracy on the streets of Harlem, . . . *on the streets of Detroit* . . . . No, we've never seen democracy. All we've seen is hypocrisy. We don't see any American dream. We've experienced only the American nightmare. [Emphasis added.]

[16] In fact, according to a juror in the Nevers trial, one of the "juror[s]" who was "not chosen to sit [apparently a venireman] . . . actually thought that the Rodney King video was a video of the Malice Green incident."

is long enough. You've been sitting down, laying down, and bowing down for four hundred years. I think it's time to stand up. [Emphasis added.]

In the second half of the film that was only seen by the Budzyn jury,[17] Malcolm X's character is forced to rescue a member of the Nation of Islam from the police station. A bystander explains that a police officer had "crack[ed]" him with (presumably) his night stick and the man began to bleed like a "stuck hog."[18] Soon after this episode, in scenes only viewed by the Budzyn jury, Malcolm X's character gives a speech before an audience in which he states (interspersed with actual footage from the 1960s of violence by white police officers against the black community):

A hundred years ago, they used to put on white sheets and sic bloodhounds on us. Well, nowadays they've traded in the sheets—well, some of them traded in sheets— . . . they have traded in those white sheets for police uniforms. They've traded in the bloodhounds for the police dogs.

\*     \*     \*

---

[17] The juror from the Budzyn trial swore to the following:

It appeared that all jurors, including our one alternate, watched *Malcolm X*, including the opening segment which showed the Rodney King footage. We began the movie on Thursday [August 5, 1993] and completed it on Friday [August 6, 1993].

A juror from the Nevers trial stated that "we watched the first, but not the second video cassette of that movie." These excerpts from the second half of the film are taken only from the second cassette.

[18] Malcolm X confronts the police who finally relent and allow him to call an ambulance and take the bleeding man from the police station to the hospital. *Id.*

> You've got these Uncle Tom negro leaders today that are
> telling us we ought to pray for our enemy. We ought to love
> our enemy. We ought to integrate with an enemy who
> bombs us, who kills and shoots us, who lynches us, who
> rapes our women and children. No! (interspersed with
> scene of Ku Klux Klan).

The greater context of the film did not dull these
words because they are strikingly inflammatory. The
power of these words might have triggered an emo-
tional response by the jury, because defendants' con-
duct, as alleged, could arguably fit the description
given by Malcolm X's character. There is some indica-
tion that it did evoke such a response. A juror from
the Budzyn trial swore that apparently this scene of
the film excited a response from one of the other
jurors while they watched the movie as a group:

> I specifically recall that segment of the movie in which
> Malcolm X compares police officers to the Ku Klux Klan. I
> also specifically recall that there was a verbal reaction by at
> least one juror when that speech was made.

As an extraneous influence, this film did not,
strictly speaking, introduce any outside information
about this event, i.e., extrajudicial facts about defend-
ants, Malice Green, or the incident itself. Neverthe-
less, the viewing of the film, with its forceful words
and images, may have undermined the juries' ability
to examine impartially defendants' credibility. Both
defendants testified and gave accounts of the alterca-
tion that conflicted with that of the witnesses for the
prosecution.[19] The images of police brutality from

---

[19] Defendant Budzyn testified on July 20, 1993, and defendant Nevers
testified on August 3, 1993.

*Malcolm X* confirmed the people's description of
defendants' conduct, thereby lending additional credi-
bility to the people's case.

Moreover, the juries may have found it difficult to
set aside, when they examined the testimony of these
particular defendants, the accusations expressed by
Malcolm X's character in the film, and suggested by
the Rodney King videotape, that white police officers
were brutal racists who could not be trusted. The
jurors may have been less willing to believe that
defendants, as white police officers, could be
trusted.[20] In focusing the jurors' attention in a very
emotional way on the racial element of the crime, the
images from the film invited the juries to view the
instant crime as a part of a pattern of police brutality,
effectively asking them to redress this injustice. The
juries were, however, bound to decide the case on
only the facts as presented at trial and to weigh
defendants' credibility without consideration of these
extraneous factors.

These themes from *Malcolm X* of racial bigotry by
the police force tied into, and intensified, the signifi-
cance of the jurors' exposure to other facts extrinsic
to the trial. The affidavits indicate that the Budzyn
jury and one member of the Nevers jury were
exposed to the fact, during deliberations, that the city
of Detroit was bracing for a riot in the event of an
acquittal. Such rioting, of course, occurred in Los
Angeles after the acquittal of the white police officers
who were charged with assaulting Rodney King. The
juror from Budzyn's trial swore that this fact had

---

[20] We are not contending that their testimony was credible, but only
that their testimony should have been reviewed without bias.

been discussed by the Budzyn jury *during deliberations*:

> During the trial at one point the question was raised whether "they" would riot if we didn't convict. Towards the end of deliberations but before I signed the verdict form, someone mentioned reports that freeways and businesses might be closed. It was also discussed that the National Guard had been put on alert for the end of the trial.

A juror in the Nevers trial indicated that he had learned from news reports and other sources about the city's preparation for a possible riot.[21] There is no indication that the Nevers jury ever discussed this point during deliberations. Yet, according to an affidavit, the Nevers jury did discuss, before deliberations, the "similarities between Rodney King and this case" because "it was cops beating a black man." Like the exposure to the film, the fact that the city braced for a riot should be irrelevant to the juries' deliberations because they are bound to issue their decisions in accordance with law. They should not consider whether there would be a riot if they acquitted. The reality is, however, that the jurors' knowledge that the city was preparing for a possible riot may have caused them to fear an acquittal.

Furthermore, the jurors were also exposed to the supposed fact that each defendant had previously

---

[21] This juror stated:

> During our deliberations, we were allowed to go home one night. While I was home, I saw a news report that in the event of a riot, they were going to close the freeways. In addition to this information, I learned various other pieces of information at different times, both before and during trial. I had learned that the National Guard was being put on alert for our verdict.

been a member of the STRESS unit. According to the affidavit of a juror from the Nevers trial, "[i]t was explained during deliberations that STRESS was a police group that regularly abused young black males in the city." The jurors also discussed this point that defendants were prior participants in STRESS *during deliberations*.[22] This is the kind of concrete, factual evidence that could substantially compromise the ability of a jury to issue a fair verdict because the evidence relates directly to the past conduct of the police officers. This extraneous influence creates more than an emotional reason to convict. It suggests, if the perceptions were true about the nature of the STRESS police unit and defendants' participation in it, that these officers may have been acting in accordance with their *preexisting racist predisposition* to target young black men for abuse when they encountered Malice Green.[23] This evidence was never introduced at trial. It is the kind of evidence that has a direct and rational connection between it and an adverse verdict. See *Bagnariol, supra* at 885. The

---

[22] The juror from the Budzyn trial swore that the assertion was raised during deliberations:

During the first few days of deliberations, [a] [j]uror . . . advised another juror in the presence of and within earshot of all the jurors that "they were part of STRESS," referring at the time to both Nevers and Budzyn. This statement appeared to be accepted and believed by my fellow jurors.

The juror in the Nevers trial stated as follows:

During deliberations, Mr. Nevers' participation in STRESS was discussed, and *it kind of set the tone from the beginning of our deliberations.* [Emphasis added.]

[23] We do not intend to express an opinion about the STRESS unit. Rather, we are only attempting to relate the jurors' perception about the character of the unit.

United States Court of Appeals for the Eighth Circuit explained how damaging such extrinsic evidence may be when it affects a defendant's credibility, particularly in a case, like this one, that was a credibility contest:

> The [extrinsic] comments [in this case] relate to factual questions that go to the heart of the jury's role: to weigh the relative credibility of witnesses in a case that turned almost entirely on whose version of events the jury found more credible. The jury's duty to resolve factual questions is severely impaired when it improperly receives information that besmirches the defendants' character. [*United States v Hall*, 85 F3d 367, 371 (CA 8, 1996).]

Similarly, in hearing that defendants were members of an allegedly violent and racist unit, the juries' ability to resolve the factual questions before them may have been severely impaired.

In relying on this extrinsic evidence regarding the STRESS unit, the juries would then have had an arguably good reason, but a legally impermissible one, to accept the emotionally charged account given by the film *Malcolm X* of the brutality of white police officers.[24] Moreover, by convicting defendants, the juries may have believed they were avoiding a possible riot in the city of Detroit. Considering all these factors, we believe that there is a real and substantial possibility that these external influences together could have affected the juries' verdicts.[25]

---

[24] This extrinsic evidence regarding defendants participation in STRESS would be particularly unfair to defendant Budzyn, because not only was there no testimony regarding his participation introduced at trial, but he was apparently never a member.

[25] We do not express an opinion regarding whether any one of these extraneous influences would have been adequate by itself to create a real

### C. HARMLESS ERROR ANALYSIS

Because defendants have carried their initial burden, we must decide whether any error was harmless beyond a reasonable doubt. There is no dispute that the extrinsic evidence was not duplicative of other properly admitted evidence for either defendant. Hence, we must determine whether the evidence against defendants was overwhelming. See *Hughes*, *supra* at 701. We believe that these extraneous influences were harmless for defendant Nevers in light of the overwhelming evidence of his guilt, but that the errors do require reversal for defendant Budzyn because the evidence against him was not overwhelming.

In the Nevers trial, the four EMS witnesses, who had no apparent motive to lie, provided interlocking testimony that Nevers repeatedly bludgeoned Malice Green in the head with his heavy police flashlight while Green was dazed and not offering significant resistance.[26] The medical testimony of the injuries to Green's head also substantiated this testimony. The people have proven that there was unimpeachable,

---

and substantial possibility that the juries' verdicts could have been affected.

[26] Martinez and Lewis arrived at the scene at the same time. Martinez testified that Nevers hit Green while Green was dangling out of the vehicle:

*Q.* Could you see any injury on Malice Green?

*A.* Just all the blood flow coming from his head.

*Q.* Could you describe that for us?

*A.* Just that he was pointed towards more of a downward position towards the street and all the blood was just coming off of his head in a big puddle outside of his car.

\*     \*     \*

*Q.* What is the next thing that happens?

*A.* [Nevers is] still ordering [Green] to open his hands and hold still and, you know, Malice Green was still moving around and his hair was flicking back at the blood splashing.

*Q.* And then what happened?

*A.* Then Mr. Nevers just reached over and had him like this telling him to hold still and he didn't hold still and he just, crack, crack.

*Q.* Now you've indicated that he, after that he starts to hit him in the head with the flashlight; is that correct?

*A.* Correct.

\*      \*      \*

*A.* At that point [Sergeant Douglas] told Officer Nevers to take it easy. Said, take it easy, Larry.

\*      \*      \*

*Q.* After that remark was made, what did Defendant Nevers do?

*A.* As I say, still holding on to him, was still hitting him. Then he gave two more quick flicks with the flashlight.

*Q.* Where did he hit Malice Green with those next two?

*A.* In the head again.

Similarly, Lewis noted that "[Green] was covered with blood . . . [h]is entire face, his hair appeared to be soaked with it, and on the ground," and that Nevers hit him anyway:

*Q.* Now, when you walk up and you are confronted with this sight, do you say anything?

*A.* I asked him what happened

\*      \*      \*

. . . and he said, I hit him. And if he doesn't quit it, I'm gonna hit him again.

\*      \*      \*

*Q.* What's the very next thing you recall happening?

*A.* The officer told him to be still, don't move, and he hit him twice on the head with the flashlight.

\*      \*      \*

*Q.* Were these two blows like one right after the other?

*A.* Yes, sir. Two, you know, rapping motions.

*Q.* Where in the head did he strike him, if you can tell us?

*A.* In the forehead around the scalp area.

compelling evidence that defendant Nevers harbored, at the very least, an unjustified intent to commit great bodily harm against Green. Thus, under *Hughes*, the extraneous influences were harmless. Consequently, we affirm the Court of Appeals decision to affirm defendant Nevers' conviction.

In Budzyn's trial, however, we believe that the evidence against defendant Budzyn, particularly considering he was convicted of second-degree murder, was not overwhelming. The evidence against him was fun-

---

\*    \*    \*

*Q.* All right. Then what happened?

*A.* He told him to be still and not to move again, and Malice Green didn't, so he hit him on the head again.

The other two EMS witnesses who arrived soon after confirmed this testimony. Walsh explained that "[Green] was covered in blood," noting that "[h]is shirt all the way up to the chest was totally covered in blood" when Nevers struck him with his flashlight. The top three or four inches of the flashlight was covered with blood. He further testified that "[Nevers] told [Green] to drop what he had in his hand [and] he struck him once in the back of the head." Hardy, who said that Green "had blood totally across his forehead, some coming down his face on the side," testified that Nevers was striking Green:

*Q.* Now, you said that you saw [Green] being struck. Can you indicate the manner that you saw him being struck at that time when you were standing right near the rear tire or bumper of the civilian car?

*A.* They weren't as rapid as the first ones that I had seen.

*Q.* As you were getting out of your rig?

*A.* Yes.

*Q.* Demonstrate, please, how they are.

*A.* They were like, you know, had more like power to them. Not as much speed.

*Q.* Not as much speed as the early ones?

*A.* As the early ones.

*Q.* Did they have some force behind them?

*A.* Yes.

damentally weaker than the evidence against Nevers
for three reasons.

First, of the three civilian witnesses who testified
that defendant Budzyn hit Green in the head with his
flashlight (Manuel Brown, Robert Hollins, and
Theresa Pace), *none* was able to see the flashlight
actually make contact with Green's head.[27] Unlike the
EMS witnesses, they did not have a direct view of the
blows. Instead, the three witnesses each inferred the
fact that the flashlight hit Green in the head from the
positions of the two men in the vehicle and from Bud-
zyn's use of the flashlight to strike Green. Brown,
who arguably gave the most damaging testimony of
any witness, was the farthest witness away, standing
fifteen feet from Fletcher, Hollins, Knox, and Pace.[28]

This testimony also contained some inconsisten-
cies. The three key witnesses who testified that Bud-

---

[27] Brown clarified his earlier testimony that Budzyn hit Green in the
head by explaining that he did not see any actual contact:

*Q.* You didn't see the contact but you saw the head go back, so
you assumed there was contact there?
*A.* That's correct.
*Q.* So yesterday when you said you saw the contact you didn't
really see it, you saw [Green's] head bouncing back?
*A.* That's correct.

Similarly, Hollins explained that he "couldn't see" where the blows actu-
ally hit from his vantage point ("I didn't see contact"), but, rather, he
determined it from their positions.

Pace also testified that she believed that Budzyn hit Green on the head,
but she was only inferring this point from their positions in the vehicle:

I couldn't see that much into the car. There wasn't much space
left on his body he could have been hitting him but his head
because of the way he was straddled on him.

Later, she admitted that she did not "see actual contact."

[28] Brown explained that he only saw the blows through the "rear win-
dow" of the car while Budzyn and Green were wrestling in the front seat.

zyn hit Green on the head with his flashlight gave conflicting testimony on the nature of the blows that Budzyn administered: Pace and Hollins testified that Budzyn lifted the flashlight above his head or shoulders and brought the flashlight down, while Brown insisted that the blows were horizontal, across his body, and that Budzyn did not lift the flashlight above his head. Also, Fletcher, who was only three to five feet away and was the closest of the witnesses to the incident, testified that Budzyn hit Green's clenched fist with the flashlight, but that he did not see Budzyn hit Green anywhere else on his body.[29]

Second, the civilian witnesses admitted that the altercation occurred after Green refused Budzyn's request that he turn over the incriminating evidence he held in his hand. The civilian witnesses all agreed that Green never complied and that he struggled with Budzyn,[30] although they said he never struck him or kicked him.[31] In fact, Fletcher testified that during the entire episode, Budzyn held onto Green's closed fist,

---

[29] Fletcher testified as follows:

    *Q.* Mr. Fletcher, . . . [Budzyn] only hits Mr. Green in the hand?
    *A.* That's all.
    *Q.* He never hit him anywhere else, did he?
    *A.* I didn't see him hit him anywhere else.

[30] Brown described Budzyn's interaction with Green as a "struggle" in which Budzyn was "trying to pull [Green's] hand away from his body." He said there would be "more blows, and then more wrestling, more blows and more wrestling." Fletcher testified that Green "wrestled back." Hollins testified that Green "scuffl[ed]" with Budzyn, trying to "get [Budzyn's] hand off him." Pace testified that Green's legs were "moving in a kicking and struggling manner" and she admitted that she said in an earlier statement that Green was kicking and fighting with Budzyn.

[31] The concurrence/dissent suggests that Budzyn "initiated" this exchange by beating Green on the hands. See MALLETT, C.J., pp 131, 135. We note that Budzyn, as a police officer, would have the right to use the necessary force to arrest a suspect who is holding cocaine. See *People v*

attempting to retrieve the contraband. This is a very different setting from the description the EMS medical technicians gave of the situation in which defendant Nevers was striking Green in the head. Because the exchange occurred in the confined context of the car with the car obscuring the witnesses' view, their testimony that Green did not kick Budzyn does not directly rebut his claim that Green did.[32] The medical evidence also does not necessarily contradict Budzyn's claims, because Nevers hit Green with significant force in the head and these blows may have been the cause of Green's extensive head injuries.

Third, in this credibility contest between Budzyn and these witnesses, the civilian witnesses all had either consumed alcohol or cocaine sometime before witnessing the exchange,[33] three of them were friends with Green (Fletcher, Hollins, and Pace),[34] and there

---

*Doss*, 406 Mich 90, 101-102; 276 NW2d 9 (1979). The question, of course, is whether his use of force was criminal because it was unnecessary.

[32] Defendant Budzyn testified that when Green closed his fist, Budzyn believed that he was holding narcotics. Defendant Budzyn said that he grabbed Green's right arm and that Green kicked him with his legs and that Green pulled Budzyn on top of him in the vehicle. Defendant Budzyn denied that he struck him at all with his flashlight or fist.

[33] Brown had earlier traveled to Fletcher's home, had used cocaine in the home, twice left the house with Knox to purchase cocaine and returned, and finally left the house before witnessing the altercation. Fletcher admitted that he had purchased and consumed alcoholic beverages that day. Hollins had driven Knox and Pace to Fletcher's home, where Hollins smoked cocaine, drank some beer, left with Pace, before returning and witnessing the altercation. Knox admitted that he had smoked the cocaine at Fletcher's home that Brown had purchased for him. Finally, Pace admitted that while at Fletcher's home she had smoked cocaine.

[34] Fletcher testified that he had known Green since they were children and that they were "very . . . good friends." Hollins had known Green since Green's childhood and said he "kn[e]w him well." Pace had known Green for several months before this incident and said that they were friends.

was some suggestion from their testimony that they
had reason to dislike these officers.[35] This fact is rele-
vant because an inquiry into whether an error was
harmless requires a focus on the nature of the error
in light of the weight and strength of the other evi-
dence. *People v Mateo*, 453 Mich 203, 215; 551 NW2d
891 (1996). Defendant Budzyn had searched Fletcher
and Knox for weapons before defendant Nevers
asked to see Malice Green's driver's license. Defend-
ant Budzyn had also broken into Fletcher's home
while Fletcher and Hollins among others were there,
a week and a half before this incident, searching the
house without warrant, and, on another occasion, had
arrested two people outside the house. Thus, these
witnesses were not in the same objective position as
the EMS medical technicians, who, incidentally, did
not offer any testimony regarding Budzyn's actions
against Green because they had not yet arrived on the
scene.

Even if the jury reasonably believed the testimony
of the civilian witnesses, they still might not have
concluded that Budzyn was guilty of second-degree
murder. The question whether Budzyn's unnecessary
use of force as described by the civilian witnesses
would be second-degree murder or manslaughter is
an issue for the jury. We do not believe that the only,
possible reasonable conclusion to draw from this evi-
dence is that it established beyond a reasonable
doubt that he harbored an intent to kill, an intent to
do great bodily harm, or to commit an act in wanton
and wilful disregard that the likelihood that the natu-

---

[35] They each referred to the officers as "Starsky and Hutch." Pace
admitted that she was "always afraid" of Budzyn. Brown said that Nevers
had previously arrested him and that he served jail time.

ral tendency of his conduct was to cause death or great bodily harm. In contrast, the testimony from the EMS medical technicians against Nevers made the conclusion inescapable that he was guilty of second-degree murder. We cannot say that the extraneous factors may not have affected the Budzyn jury's verdict. We, therefore, reverse his conviction and remand for a new trial.

### CONCLUSION

We affirm defendant Nevers' conviction, but reverse defendant Budzyn's conviction and remand his case for a new trial. Thus, we affirm in part and reverse in part the decision of the Court of Appeals.

BRICKLEY, CAVANAGH, and WEAVER, JJ., concurred with RILEY, J.

BOYLE, J. (*concurring in part and dissenting in part*). I agree with the majority's result and rationale with regard to defendant Nevers,[1] and its result in respect to defendant Budzyn. I write separately to explain my disagreement with certain aspects of the rationale in *Budzyn*.

First, despite differences of origin, history, class, education, race, ethnicity, sex, economic status, or educational level, it is a fundamental presumption of the judicial system that all Americans are equally capable of fairly discharging their public responsibilities. *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90

---

[1] Neither the majority nor the dissent addresses Nevers' motion for change of venue. I conclude that although the issue is closer than either opinion acknowledges, there is an insufficient showing to overcome the presumption that the community was able to seat a jury that could adhere to its oath. *People v Jendrzejewski*, 455 Mich 495; 566 NW2d 530 (1997).

L Ed 2d 69 (1986). Therefore, I disagree with the analysis of the opinions of both Chief Justice MALLETT and Justice RILEY regarding the showing of the movie, *Malcolm X*, to the extent that each employs assumptions about the predispositions of jurors. The system addresses the mind-set of jurors through voir dire, challenges for cause, and motions for change of venue, all of which require a demonstration of reasons why a prospective juror or a given community may be suspect. The approach is both aspirational and pragmatic. The judiciary has no competence to assess the cultural or psychological mind-set of a given jury and assess its reactions in light of its own assumptions. I also agree with the prosecution that the movie was not an extraneous communication, *Tanner v United States*, 483 US 107; 107 S Ct 2739; 97 L Ed 2d 90 (1987), and find no error in this regard.

Second, I have reservations regarding the majority's resolution of the issue regarding juror knowledge during deliberation of contingency plans in the event the verdict was an acquittal. Prospective jurors were questioned regarding whether they would find Budzyn guilty in order to avoid a riot, and the jury as seated was presumptively not vulnerable to such pressure. However, while this is not a situation in which community sentiment developed after the trial had begun, reports that freeways and businesses might be closed might have made real what during voir dire was purely hypothetical. While not free from doubt,[2] I would conclude that, although discussed during delib-

---

[2] Case authority requires a showing of materiality to guilt or innocence. *United States v Bagnariol*, 665 F2d 877 (CA 9, 1981).

erations, this information, standing alone, would not require reversal.

However, I agree with the majority that the communication of incorrect information to the jurors during deliberations that defendant Budzyn was a member of STRESS was error requiring reversal.

While I do not evaluate the evidence precisely as does the majority,[3] I agree that the evidence in *Budzyn* was not as strong as that in *Nevers*. Evaluated in the context of the evidence as a whole, the prejudicial significance is that Budzyn's membership in STRESS indicated a propensity for abuse of young black males. By all accounts, Green had what turned out to be cocaine in his hands and refused to surrender it. Thus, Budzyn's initiation of force against Green was lawful, whichever version of the testimony is believed. The issue in Nevers' trial turned on whether the jury believed Nevers' testimony that the deceased was trying to take his gun, thus justifying the life-threatening response. The issue in Budzyn's trial, by contrast, was whether, and at what point, the lawful use of force became unreasonable.

In substance, the jurors were told that Budzyn was a bad actor with a propensity for violence against young black men. Coupled with other evidence admitted at trial, this information could have persuaded the

---

[3] The fact that some witnesses knew Malice Green very well or that they all had consumed either alcohol or cocaine before witnessing the exchange goes to bias and capacity to observe, which are routine jury questions. If these witnesses had been those who saw Nevers' actions, for example, I doubt that the majority would find these factors relevant to the analysis. Moreover, these observations are inconsistent with the fact that only Brown testified about having seen a visible manifestation of the contact, that is, the movement of the decedent's head. Fletcher, the person closest to Green in terms of a prior relationship, testified that he did not see Green struck anywhere except on his hands.

jurors that Budzyn had a man-endangering state of mind. Thus, it is not only the fact, as the majority observes, that this evidence was relevant to besmirching the defendant's character, *United States v Hall*, 85 F3d 367, 371 (CA 8, 1996), but the fact that this information supported the prosecution's theory that defendant was guilty of second-degree murder, *United States v Bruscino*, 662 F2d 450 (CA 7, 1981), that is prejudicial.

Our responsibility is not to decide what we would have done or what we think the jury should have done. It is to hypothesize what the jury would have done had it not been exposed to the extrinsic information. Because there was substantial and real prejudice, *United States ex rel Owen v McMann*, 435 F2d 813 (CA 2, 1970); *United States v Bagnariol*, 665 F2d 877 (CA 9, 1981), I cannot conclude that the error was harmless beyond a reasonable doubt. I join in the opinion for reversal of defendant Budzyn's conviction of second-degree murder. I would affirm the conviction of defendant Nevers.

MALLETT, C.J. (*concurring in part and dissenting in part*). Malice Green died en route to the hospital, as a result of blunt force trauma to the head[1] sustained while the defendant police officers attempted to arrest him. Following a joint trial before separate juries, defendants were found guilty of second-degree murder, MCL 750.317; MSA 28.549, and were sentenced to terms of eight to eighteen years (Budzyn) and twelve to twenty-five years (Nevers). The defendants appealed, first in the Court of Appeals and then in this Court, raising numerous claims of error. I

---

[1] Wayne County Medical Examiner autopsy report.

would affirm the convictions, finding that none of the issues raised constitute error requiring reversal.

The difficulty of this Court's decision in this highly publicized and emotionally charged case was not caused by the emotional nature of the case, or by the publicity surrounding it. Nor was it caused by the infusion of race into some of the legal issues presented.[2] This case demanded careful examination because the legal questions presented are difficult and close.

The issues of greatest concern to both the majority and to myself relate to whether defendants were denied their right to a fair trial as a result of exposure to certain extraneous influences. In particular, I am most concerned with the jurors' exposure to the movie *Malcolm X* and to media accounts of contingency plans of suburban law enforcement in case of a riot. I will examine the issue of jury taint in detail. While I have also closely examined the other issues presented by the defendants, I will not discuss them in depth, finding them either lacking in merit or properly disposed of by the Court of Appeals.

I

FACTS

The Court of Appeals unpublished opinion per curiam sets forth the following factual account of the case:

---

[2] The facts of this case bear some similarities to the Los Angeles case in which the beating of black motorist Rodney King by white police officers was heavily broadcast throughout the country. Severe rioting followed the acquittals of the officers in that case. In the present case, the victim was black. The defendant police officers are white. Ten of the twelve Nevers jurors were black; eleven of the twelve Budzyn jurors were black.

Defendants' convictions arise from events that occurred on the evening of November 5, 1992, in the city of Detroit, on the street outside of the storefront building apartment of Ralph Fletcher. Defendants were on duty as Detroit City Police Officers, in plain clothes, patrolling the area in an unmarked police car. They were keeping "loose surveillance" on a stolen Ford Tempo automobile in the area. Malice Green was driving Fletcher to his apartment in a similar model automobile, a red Topaz.

Shortly after Green parked his vehicle in front of Fletcher's home, defendants drove by, stopped, backed up, and parked their police car behind Green's vehicle. At that time, Theresa Pace, Robert Hollins, and Robert Knox were leaving Fletcher's apartment from the back door. Defendants initially focused on Green's vehicle to determine whether it was the stolen Tempo. They then spotted Knox, who appeared to run toward the back of Fletcher's house. Budzyn then pursued Knox and escorted him back to the area in front of the house. Fletcher and Green were standing beside Green's vehicle while defendant Nevers was standing beside the parked police car.

When Green was asked for his driver's license, he reentered his vehicle through the passenger side door and reached for the glove box. As he was sitting in the car sideways with his legs extending outside, Budzyn saw Green drop something, which appeared to be rock cocaine, and hold something in his right hand. When Green failed to obey Budzyn's orders to open his hand, Budzyn reached in and grabbed Green's right forearm. A struggle ensued.

According to Fletcher, Pace, Hollins, Knox, and Manuel Brown (who had also been stopped by defendants while walking in the area), Budzyn climbed on top of Green, straddled him as he laid back across the front seat, and hit him repeatedly with his flashlight. These witnesses further testified that Green did not appear to fight back, but continued to clench his right hand, despite Budzyn's repeated orders and the urging of the bystanders. Budzyn testified before his jury that he never hit or straddled Green. Nevers also testified to his separate jury that he never saw Budzyn hit Green, and although he heard some sounds of impact,

he denied knowing or believing that those sounds were caused by Budzyn striking Green.

Fletcher, Pace, Hollins, Knox, and Brown observed Budzyn strike Green with his flashlight on the hand or hands; however, not all of these witnesses could see whether Budzyn ever struck Green in the head or elsewhere. Fletcher, who was standing directly beside Green's car approximately three to five feet away at the time, testified that he only saw Budzyn strike Green on the hand. Fletcher explained, however, that he had stepped away when Budzyn climbed further into the car and therefore was unable to see whether Budzyn ever hit Green in the head or not. Pace and Hollins, who stood a few yards away from Fletcher beside the front of the parked police car, only saw Budzyn hit Green in the hand as well. However, once Budzyn was on top of Green inside the car, they saw Budzyn swing his flashlight up over his shoulder and back down toward Green several times. They also testified that it appeared as though the blows were landing on top of Green's head, possibly his forehead, from the sounds of impact and the positions of Green and Budzyn. Hollins estimated that Budzyn landed at least six or seven such blows. Brown, who was standing at a somewhat elevated position on the curb behind Green's car and approximately fifteen feet from the others, testified that he actually observed Budzyn hitting Green in the head with his flashlight approximately ten times.

At some point, Nevers walked over to the passenger side of Green's car and struck Green's clenched hand and knees with his flashlight. Nevers retrieved some rock cocaine from the car and told Fletcher and the other citizens nearby to leave, or that they were free to leave. As Nevers walked around to the driver's side door, Pace and Hollins walked to a parked truck and drove off. Fletcher testified that as he was walking toward his home, he turned and saw Nevers strike Green twice on the head with his flashlight from the open driver's side door, using a sweeping "golf swing." Brown saw Nevers strike Green several times from a position where it appeared to Brown as though the blows would have been landing on Green's head, although he was

unable to see whether there was actual contact. He esti-
mated that Nevers hit Green approximately 15 times,
including the initial hits on Green's hand and knuckles.
Nevers admitted hitting Green in the head with his flash-
light a total of five or six times. He explained that he hit
Green two or three times when Green grabbed the handle
of his sidearm and then struck Green another two or three
times when it appeared as though Green was holding a
razor blade or knife in his hand.

Two EMS ambulance units from the Detroit Fire Depart-
ment, designated as units "Impact 5" and "Medic 7," arrived
on the scene. Each unit had two medical technicians who
testified that Nevers repeatedly struck Green in the head
with his flashlight as he lay across the front seat of the car
with his head outside the driver's side door while ordering
Green to open his hands and/or to be still. Technicians
Albino Martinez and Mithyim Lewis of the Impact 5 unit
saw Nevers strike Green in the head a total of four times.
Technician Scott Walsh of the Medic 7 unit saw Nevers
strike Green with the flashlight once on the head, and later
on the chest and abdomen. Technician Lee Hardy of the
Medic 7 unit saw Nevers strike Green on the head about ten
times and on the left hand four or five times. According to
each technician, Green was bleeding heavily and covered
with blood. He also was dazed or in a stupor, neither
resisting nor responding to Nevers' commands, but only
moaning or muttering incomplete words. Ultimately, Green
was pulled from the car by Robert Lessnau, a uniformed
police officer who had arrived on the scene. Green was
handcuffed while he lay face down in the street in a pool of
his own blood. Later, Green suffered a seizure while the
medical technicians were rendering treatment and died dur-
ing the transport to a hospital.

An autopsy was performed by Assistant Wayne County
Medical Examiner Kalil Jiraki. There were nine cuts and a
bruise on Green's scalp, and other bruises and cuts on the
face and behind the ears. Jiraki opined that these wounds
were caused by at least fourteen separate blows to the
head. Most of the wounds were consistent with having been
made with a cylindrical instrument such as a flashlight.

Jiraki found no fracturing of the skull, and only minimal swelling of the brain. Although Jiraki found levels of cocaine in Green's blood consistent with being under the influence of cocaine at the time of death, he opined that those levels were too small to have any significance and had no bearing on Green's death at all.

Additional expert medical testimony was rendered from defense experts Dr. L. J. Dragovic, Chief Medical Examiner for Oakland County, Dr. Haresh Mirchandani, Chief Medical Examiner of Philadelphia, Dr. Lucy Rorke, as well as the prosecution's rebuttal witness, Dr. Michael Baden. All of the defense experts disagreed with Dr. Jiraki's opinion that the cause of death was blunt force trauma alone, without any effect from cocaine, and disagreed with his description of the mechanism or mechanisms of death as well. For example, Dr. Dragovic opined that the mechanism of death was seizure activity triggered as a result of the trauma upon the surface of Green's head while his brain was "wired up" on cocaine. Dr. Mirchandani opined that Green died of a cardiac arrhythmia caused by a combination of cocaine use, physical exhaustion and trauma from the beating. Although there was some disagreement whether the head trauma alone might have caused death, all of the defense experts agreed that the beating at least played a role in Green's death. All of the experts, except Dr. Rorke, opined that Green would not have died at that time without the beating. Only Dr. Rorke suggested that Green might have died even without the beating.[3]

Defendants were tried together but before separate juries. Robert Lessnau, who was also charged in this case, was granted a bench trial. Following selection of defendant Nevers jury, Nevers' motion for change of venue based upon pretrial publicity was denied. Ultimately, defendants' respective jurors found them guilty of second-degree mur-

---

[3] I note at this juncture that defendants initially argued that the jury had not been properly instructed regarding causation. Since submitting their initial briefs, this Court decided *People v Tims*, 449 Mich 83; 534 NW2d 675 (1995), which held that the causation element is satisfied if the defendant's actions are merely *a* cause, not necessarily *the* cause of death. Consequently, defendants have conceded this claim of instructional error.

der, and the trial court sentenced both defendants within the low range of their respective guideline sentence ranges—defendant Budzyn receiving an 8- to 18-year sentence and defendant Nevers receiving a 12- to 25-year sentence. . . . [Issued March 22, 1995 (Docket Nos. 170477, 170478), slip op at 1-3.]

From the outset, the case engendered a flurry of media reports. This was due in part to the similarities between the case, involving white police officers and a detained black motorist, and the California acquittals of white Los Angeles police officers charged in the beating of black motorist Rodney King. Extensive media coverage continued through the trial, including reports speculating on contingency plans in place in the event of postverdict rioting. Jurors on both Budzyn's and Nevers' panels were exposed to portions of these reports.

Near the end of the trial, during a two-day recess in the proceedings, the court provided videotape movies for the jurors' entertainment. One of the movies provided was *Malcolm X*, which depicts, in its opening credits, footage of the Rodney King beating with accompanying dialogue from a speech by Malcolm X. Both juries viewed at least part of the film. Defendants moved for a mistrial, arguing that this opening footage caused special prejudice and that the film was inappropriate for viewing in the context of this case. This motion was denied.

After the juries rendered their verdicts, the defendants filed motions for new trials, in part on the basis of the potential prejudicial effect on the jury of exposure to the movie *Malcolm X* and to media reports. This motion was also denied.

The defendants appealed their convictions, raising numerous issues including those relating to improper jury instructions, juror taint and bias, various improprieties on the part of the trial judge and the prosecution, and insufficiency of evidence. Finding no errors requiring reversal, the Court of Appeals affirmed the defendants' convictions. Unpublished opinion per curiam, issued March 22, 1995 (Docket Nos. 170477, 170478). This Court granted leave to appeal.[4]

II

EXTRANEOUS INFLUENCES; JURY TAINT

Defendants who choose a jury trial have an absolute right to a fair and impartial jury. *Duncan v Louisiana*, 391 US 145; 88 S Ct 1444; 20 L Ed 2d 491 (1968); *People v Tyburski*, 445 Mich 606, 618; 518 NW2d 441 (1994). The defendants argue that they were denied this right by a combination of prejudicial publicity surrounding the case and instances of extraneous influences on the jury during the trial. I will focus on what I believe to be the two most troubling of these claims: jury exposure to the movie *Malcolm X* and to media reports during the trial of existing contingency plans in case of rioting after the verdict.

Before examining these claims of jury taint, I shall review the general principles and analysis applicable to determining claims of extraneous influences on jury verdicts.

---

[4] 451 Mich 884 (1996).

A

GENERAL PRINCIPLES

Implicit in our jury system is an initial presumption of jury impartiality. See *United States v Ruggiero*, 56 F3d 647, 652 (CA 5, 1995). Evidence that extrinsic factual matters tainted the jury's deliberations can defeat this initial presumption. *Sheppard v Maxwell*, 384 US 333, 351; 86 S Ct 1507; 16 L Ed 2d 600 (1966); *Ruggiero, supra* at 652, quoting *United States v O'Keefe*, 722 F2d 1175, 1179 (CA 5, 1983). While the use of postverdict juror affidavits or testimony to impeach a jury verdict is generally prohibited, an exception applies where the jury is exposed to "extraneous influences" that may have improperly influenced its deliberations. *Tanner v United States*, 483 US 107, 117; 107 S Ct 2739; 97 L Ed 2d 90 (1987), and *People v Larry Smith*, 106 Mich App 203, 211-212; 307 NW2d 441 (1981).

Thus, postverdict inquiries into extraneous influences on the jury must balance the defendant's right to a fair trial by an impartial jury with the long-established common-law rule prohibiting the admission of juror testimony to impeach a jury verdict. See *Tanner, supra* at 117-127. The purposes underlying the general rule against impeachment of jury verdicts include promoting finality of jury verdicts, discouraging harassment of jurors, reducing incentives for jury tampering, and encouraging free and open discussion among jurors. See *Tanner* at 119-120. The common-law rule and the exception for extraneous influences has been codified in federal law.[5] Michigan follows

---

[5] FRE 606(b) provides:

the federal rule. *People v Larry Smith, supra* at 211-212.

Extraneous influences include publicity received and discussed in the jury room, consideration of evidence not admitted in court, and communications or other contact between jurors and third persons. In contrast, evidence of discussions among jurors, intimidation or harassment of one juror by another, and other intrajury influences do not come within the exception and may not be used to impeach a verdict. *United States v Williams-Davis*, 821 F Supp 727, 733 (D DC, 1993). In other words, while the exception allows the use of juror testimony or affidavits, the general rule still prohibits probing into the actual deliberative process. Thus, the jurors may testify regarding their exposure to these influences, but they may not relate how such exposure affected the deliberative process.

B

BURDEN-SHIFTING ANALYSIS

Several state and federal cases are instructive regarding how prejudice resulting from extraneous influence may be proved and when such influences require reversal. A review of these cases reveals that

[A] juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . , *except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention* . . . . Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes. [Emphasis supplied.]

most courts employ a burden-shifting analysis. Once
the defendant comes forward with evidence establish-
ing the existence of an extraneous prejudicial influ-
ence, the burden shifts to the government to rebut
the presumption of prejudice by showing that the
extraneous influence was harmless error. I agree with
and would adopt this two-part analysis. Thus, as will
be more fully set forth in this section, to determine
whether the extraneous influences merit reversal, I
would hold, as does the majority, that reviewing
courts must first determine whether the defendant
has made the required threshold showing that the
extraneous materials were prejudicial and must then
examine whether the prosecution has shown that the
jury's exposure to the materials was harmless.

1

THRESHOLD SHOWING OF PREJUDICE

Regarding the initial threshold showing required of
the defendant, the United States Court of Appeals for
the Second Circuit, in a seminal opinion by Judge
Henry Friendly, stated that

> [t]he touchstone of decision . . . is thus not the mere fact
> of infiltration of some molecules of extra-record matter,
> with the supposed consequences that the infiltrator
> becomes a "witness" and the confrontation clause automati-
> cally applies, but the nature of what has been infiltrated
> and the probability of prejudice. [*United States ex rel Owen
> v McMann*, 435 F2d 813, 818 (CA 2, 1970).]

Thus, generally, to impeach a verdict, the defendant
must first establish the existence of the extraneous
influence. Even with this burden met, however, the
defendant will not be entitled to a new trial unless

there is some further showing of prejudice. *Williams-Davis, supra* at 733; *United States v Boylan*, 898 F2d 230, 258 (CA 1, 1990).[6]

The extraneous matters will not meet the initial threshold unless "there is a 'reasonable possibility' that such material could have affected the verdict." *Williams-Davis, supra* at 734, quoting *United States v Ortiz*, 942 F2d 903, 913 (CA 5, 1991). Courts have articulated guidance, but have not created "bright line" rules for determining when the real and substantial possibility of prejudice standard is met.

> There is no magic formula for deciding whether extrinsic material disclosed in the jury room was reasonably prejudicial. The determination in each case in which such an issue is presented must be evaluated in light of its own unique circumstances. [*United States v Gaffney*, 676 F Supp 1544, 1553 (MD Fla, 1987).]

The Ninth Circuit and other courts have set forth several factors relevant to determining whether extrinsic materials could reasonably have been prejudicial. For example, in *State v Watkins*, 526 NW2d 638, 641 (Minn App, 1995), the court considered the following factors, among others, in estimating the probable prejudicial effect of racial slurs on the jury: "(1) the nature and source of the prejudicial matter, (2) the number of jurors exposed to its influence . . . and ([3]) the likelihood that curative measures were effective in reducing the prejudice."

---

[6] An exception applies to certain ex parte communications. For example, ex parte communications from judge to jury during deliberations are presumed prejudicial. *People v France*, 436 Mich 138; 461 NW2d 621 (1990).

The Ninth Circuit has identified similar factors, including: (1) whether the extrinsic material was actually received and if so how, (2) the length of time it was available to the jury, (3) the extent that the jurors discussed and considered it, (4) whether it was introduced before a verdict was reached and if so at what point during the deliberations, and (5) the length of time the jury deliberates after exposure to the extrinsic material.[7] Regarding this last factor, if the jury was deliberating for a significant time before exposure to the extrinsic evidence and then quickly rendered a verdict after the exposure, the information likely affected the verdict. The Ninth Circuit does not consider any one factor as being determinative in any given case. *Dickson v Sullivan*, 849 F2d 403, 406 (CA 9, 1988).[8]

2

HARMLESSNESS OF THE EXTRINSIC MATERIALS

Once the defendant has met the burden of coming forward with competent evidence regarding prejudicial extraneous matters, the burden shifts to the state to prove that exposure to the extraneous influences was harmless error. Cases provide guidance regarding how the government may establish harmless error in this context. Exposure to extraneous prejudicial mat-

---

[7] See *United States v Caro-Quintero*, 769 F Supp 1564, 1575 (CD Cal, 1991); *Marino v Vasquez*, 812 F2d 499, 506 (CA 9, 1987), citing *Bayramoglu v Estelle*, 806 F2d 880, 887 (CA 9, 1986).

[8] Some of the cases from the Court of Appeals for the Ninth Circuit discuss the factors relevant to determining prejudice as part of the harmless error determination and some simply combine the threshold prejudice prong of the test with the harmless error prong. I would apply the relevant factors as part of the threshold inquiry because they are more applicable to determining the level of potential prejudice than to the harmless error inquiry.

ters may be deemed harmless if the extraneous material is merely duplicative of evidence introduced in open court, or if the other evidence amassed at trial was so overwhelming that the jury would have reached the same result even without the extraneous material. *United States v Caro-Quintero*, 769 F Supp 1564, 1574 (CD Cal, 1991); *Hughes v Borg*, 898 F2d 695, 700 (CA 9, 1990). The Court of Appeals for the Ninth Circuit has stated that such a determination of overwhelming evidence will rebut the presumption of prejudice in this context when "the other evidence adduced at trial [is] 'so overwhelming that "we can say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." ' " *Caro-Quintero, supra* at 1575, quoting *Hughes, supra* at 701. We believe this standard is generally appropriate and essentially comports with the standard for harmless error applicable to errors of constitutional magnitude as adopted by this Court in *People v Anderson (After Remand)*, 446 Mich 392; 521 NW2d 538 (1994).[9] Consequently, exposure to prejudicial extrinsic materials is harmless error if the reviewing court may conclude, beyond a reasonable doubt, that the other evidence adduced at trial is so overwhelming that there is no real and substantial possibility that the challenged evidence contributed to the conviction. *Anderson, supra* at 406.

---

[9] The asserted error is of constitutional magnitude. Outside influences are not subject to cross-examination and cannot be confronted by the defendant. Consequently, this type of claimed error directly affects the right to a fair trial and must be evaluated under the stringent beyond a reasonable doubt standard.

With these guiding principles in mind, I shall consider whether the extraneous influences asserted require reversal of the convictions.

### III

#### MALCOLM X

I will first examine the movie *Malcolm X*. The first inquiry is whether the defendants have met their threshold burden by bringing forward competent evidence of a prejudicial extraneous influence. Defendants rely, in part, on sealed affidavits of four jurors[10] to establish that the jurors had watched the movie *Malcolm X* during a recess. I do not question the limited use of the signed affidavits to show exposure to this extraneous influence. I also note that existence of this influence was established on the record in the motion for mistrial.

As noted earlier, beyond showing exposure to an extraneous influence, the defendants, absent an unauthorized ex parte communication,[11] must make a showing of prejudice reverberating from the extraneous information. The test for determining whether the threshold level of prejudice is met is whether defendants have established a real and substantial possibility that the extraneous matter could have affected the verdict.

---

[10] One Budzyn juror and two Nevers jurors submitted signed affidavits. An additional Nevers juror prepared, but did not sign, a statement.

[11] I would reject the defendants' argument that because the court provided the videotapes from which the jurors made their choice, the movie should be viewed as an ex parte communication from the judge to the jury, thus warranting a presumption of prejudice. *People v France*, n 6 *supra*. Defendants' conclusion in this regard goes beyond the holding in *France*.

The first factor in this threshold inquiry is the nature and source of the extraneous material. The defendants focus their claim of prejudice resulting from the showing of *Malcolm X* on the opening footage of the movie. In an attempt to make his movie more provocative, producer-director Spike Lee presents opening footage of the beating of motorist Rodney King by Los Angeles police officers against the backdrop of a burning American flag. Along with these images, the viewer hears words from a speech by Malcolm X.

Virtually every person in America had been exposed to the footage detailing the brutal beating given Mr. King by members of the Los Angeles Police Department. While it was unfortunate that the jurors were perhaps once again confronted with this footage, is it the defendants' position that the jurors became inflamed and were engulfed by emotion and thus rendered incapable of rendering a fair verdict? The possibility that a few police officers will absolutely violate department rules and procedures is never far from the minds of African-Americans, no matter their station in life. The presence of racism in any community can, and sometimes does, cause American citizens to react emotionally and render less than clear judgment. But there is no reasonable probability that the Rodney King footage affected the jurors in this case.

Racism has not and will not quell the desire of African-Americans to fully exercise all the rights and responsibilities associated with democracy. If this were not true, then the four-hundred-year-old struggle for freedom and economic opportunity would have been abandoned long ago. The defendants have not

established that the picture of one black man being
beaten by police officers could reasonably have pre-
vented the jurors from rendering a fair verdict.

The words of Malcolm X in the opening sequence
are indeed provocative.[12] But when these words are
taken in the context of the effect of the overall mes-
sage of the movie, their effect is greatly lessened.[13]
Please be clear, I do not dismiss the power of words.
I do dismiss the conclusion that there is a real and
substantial possibility that conscientious jurors
watching this movie, shown during a recess purely for
entertainment purposes, would have allowed it to
affect their verdict.[14]

Regarding the nature and source of this extraneous
influence, the defendants emphasize that the movie
was supplied by the court; this factor alone is not
determinative. While this fact does tend to bolster the

---

[12] For example:

> Brothers and Sisters, I am here to tell you that I charge the white
> man, I charge the white man with being the greatest murderer on
> earth. . . . I charge him with being the greatest kidnapper on
> earth, I charge him with being the greatest murderer on
> earth . . . . We didn't see any democracy on the streets of Har-
> lem . . . on the streets of Detroit . . . . We've experienced only
> the American nightmare.

[13] I note that the Nevers jurors did not watch the entire movie, but only
watched it for approximately forty-five minutes. Another Nevers juror
indicated that they watched the entire first cassette, but did not watch the
second cassette. Although the Nevers jurors did not view the entire
movie, they viewed enough of it to have a flavor of its message and to
place the opening sequence in context.

[14] In evaluating the nature of this extraneous influence and its likely
effect on these jurors, I cannot ignore the fact that most of the jurors
were African-Americans. These jurors were undoubtedly intimately and
personally aware of the problems in this country brought to the forefront
by the Rodney King incident. If they could set aside their personal knowl-
edge of police brutality, they could surely set aside any potential emo-
tional effect of the movie.

movie's potential prejudicial effect, the nature of this particular extraneous influence weighs heavily against a finding of prejudice. The movie was chosen by the jurors from three others made available to them purely for purposes of entertainment.[15] The jurors should be credited with enough sophistication to separate entertainment from evidence.

Another important factor relevant to the threshold inquiry is the timing of the jurors' exposure to the movie. The jurors were not exposed to this extraneous influence during deliberations, but during a two-day recess near the end of the trial. Extraneous influences during the deliberative process are deemed more prejudicial than those finding their way to the jury earlier in the trial. This fact distinguishes this case from others finding that juror exposure to a movie of a potentially prejudicial nature during deliberations required reversal. See *Seekers v State*, 35 Ala App 40; 44 So 2d 628 (1949); *Gonzales v State*, 593 SW2d 288 (Tenn, 1980).[16]

---

[15] Other choices included *Body Guard, Leap of Faith*, and *Scent of a Woman*.

[16] Other cases requiring reversal on grounds of juror exposure to a movie before deliberations are also distinguishable. In *State v RW*, 200 NJ Super 560; 491 A2d 1304 (1985), the court refused to instruct jurors near the beginning of the trial not to watch a movie airing on television that depicted child abuse. The court reversed the child sexual abuse convictions, finding that the movie at least combined with other errors to require a new trial. Significant to the court's analysis was the fact that the only evidence of defendant's guilt was the testimony of the three-year-old child and that the trial judge could have avoided any potential prejudice by instructing the jurors to avoid watching the movie.

In *State v Blanks*, 479 NW2d 601 (Iowa App, 1991), the court focused on parallels between the plot of the movie *Gorillas in the Mist* with the facts of the case before it. The prosecutor referred to the movie in closing argument. Because of these parallels, and the potential that reference to the movie could be interpreted as having racial overtones by the jury, the court held that a new trial was required.

Other factors relevant to the initial threshold inquiry have not been argued or sufficiently developed by the defendants in order to support their burden. Regarding the number of jurors exposed to the movie, while the affidavits seem to indicate that every member of both juries was present in the room during the playing of at least part of the movie, they do not clearly indicate that every member actually viewed it. Regarding discussion of the extraneous material among the jurors, the defendants have not established that the movie was extensively discussed. Finally, the timing of exposure and the length of deliberation do not support a conclusion that the movie affected the verdict. As already noted, those jurors who watched the movie did so well before deliberations began, and before being charged by the court to consider only the evidence before them, free

---

A review of these, and other, "movie" cases reveals certain trends in the decisions. See anno: *Permitting jurors to attend theater or the like during course of criminal trial as ground for mistrial, new trial, or reversal*, 33 ALR2d 847. The early cases are characterized by a reluctance by courts to "speculate" regarding prejudice. If there were any chance that the movie might have influenced the verdict at all, reversal was deemed required. Later cases, however, reveal a more searching analysis regarding whether the movie was likely to have a prejudicial effect in light of all of the circumstances. Factors relevant to the inquiry appear to be: (1) whether the jury viewed the movie apart from others, thus lessening the chance of interaction and potential influence from outside persons, (2) whether the movie was viewed during deliberations, (3) the similarity of the film to the case and the potential for prejudice resulting from any similarities, and (4) the weight of the evidence against the defendant.

These factors weigh against ordering a new trial in this case. The jurors viewed the movie alone, separated from outside persons. Further, they did not view it during deliberations. Apart from the brief opening sequence, and some isolated historical depictions of police brutality, the overall plot and message of the movie bore no similarities to the facts in the case. Finally, the weight of evidence against the defendants was substantial.

from prejudice or sympathy.[17] Further, both juries deliberated for a substantial period, more than a week, before rendering a guilty verdict. Consequently, rather than supporting their threshold burden, the timing and length of deliberation here supports the conclusion that the movie did not likely play a role in the verdicts.

Given the unique facts of this case, defendants have failed to meet the threshold burden of establishing a real and substantial possibility that the viewing of the movie *Malcolm X* affected the verdicts. Virtually every factor courts have identified as relevant weighs against a finding that the movie could reasonably have affected the verdicts.

I would further find that, even if the defendants had met their initial burden, a reversal is not required here because it can be said, beyond a reasonable doubt, that the other evidence adduced at trial was so overwhelming that there is no real and substantial possibility that viewing the movie might have contributed to the convictions. *Anderson, supra.* In this regard, I agree with the Court of Appeals conclusion that reversal, on the basis of the showing of *Malcolm X*, was not required. The Court of Appeals explained that reversal was not required

> given the overwhelming evidence against defendants in favor of the convictions. By all eyewitnesses' accounts, both defendants struck Malice Green repeatedly with their flashlights while he offered little, if no, resistance. Fletcher, Pace, Hollins, Knox and Brown testified that Budzyn initiated the beating by repeatedly striking Green with his flash-

---

[17] It is also noteworthy that the trial court, throughout the trial, repeatedly admonished the jury to view only the evidence admitted at trial and took scrupulous care to remind them to avoid outside influences.

light on the hands. Despite their inability to directly observe
Budzyn striking Green in the head, these witnesses testified
that Budzyn was on top of Green inside the car and was
swinging his flashlight over his shoulder down toward
Green. Based on this position and the sounds, it appeared
to them that Budzyn's blows impacted Green's head. Fur-
thermore, Brown actually saw Budzyn strike Green in the
head several times. In addition to some of these witnesses,
the testimony from the four medical technicians established
that Nevers struck several blows while Green was covered
in blood.

Moreover, the number of cuts and bruises that Green sus-
tained exceeded the number of blows to which defendants
admitted rendering. Budzyn denied hitting Green at all,
whereas Nevers admitted hitting Green five or six times.
However, the medical examiner found nine cuts on Green's
scalp and other cuts and bruises on his face and behind the
ears. In all, the medical examiner opined that Green sus-
tained at least fourteen separate blows to his head. Along
with the testimony from civilian and medical eyewitnesses,
the obvious implication is that either or both defendants
were minimizing the amount of force utilized in arresting
Green in order to justify the murder. Thus, in light of this
evidence, we cannot say that the jury convicted defendants
on the basis of emotions that could have arisen from watch-
ing the videotape. The evidence clearly supports the ver-
dicts of second-degree murder. [Slip op at 6.]

I respectfully disagree with the majority's conclu-
sion that the evidence supporting second-degree mur-
der against defendant Budzyn was not overwhelming.
As noted by the Court of Appeals, and supported in
the record, all five of the eyewitnesses, Fletcher,
Pace, Hollins, Brown, and Knox, testified that Budzyn
initiated the beating by repeatedly striking Green on
the hands. Witnesses Pace and Hollins, who observed
the scene from essentially the same vantage point,
saw Budzyn swinging his flashlight over his shoulder
down toward Green in the direction of Green's head.

They both testified that on the basis of the position-
ing of Budzyn and Green, and the sound of impact, it
appeared that Budzyn was repeatedly hitting Green
on the head with his flashlight.[18] Further, eyewitness

---

[18] For example, Theresa Pace testified as follows:

*Q.* All right. When you say that Defendant Budzyn goes over,
grabs his hand, starts beating it, he then, you said, straddled him,
or words to that effect; is that right?

*A.* Yes.

\*    \*    \*

*Q.* And when he actually straddles him, is he in a face to face
position with Malice Green?

*A.* Yes, he is.

*Q.* Where do you see him striking him at this point with the
flashlight?

*A.* I couldn't see that much into the car. There wasn't much
space left on his body he could have been hitting him but his head
because of the way he was straddled on him.

\*    \*    \*

*Q.* When he began to hit him, hit Malice Green in the knuckles,
can you show us what motion he used to do that as best you can?

*A.* Like this.

*Q.* And you are indicating an up and down motion?

*A.* Yes.

*Q.* Over the hand; is that right?

*A.* Yes.

*Q.* He straddles him; is that right?

*A.* Yes, he does.

*Q.* Describe what you see then.

*A.* The flashlight is still in his hand, he's like this (indicating) hit-
ting Malice.

*Q.* And you are indicating an overcoming up and down motion?

*A.* Yes, sir.

*Q.* Over your shoulder; is that right?

*A.* Yes.

\*    \*    \*

*Q.* Can you tell us what part, based on where you were at and
what you saw, what part of Malice Green's person would have been
underneath this light . . .

Brown, who observed the scene from a different vantage point, standing on the curb at a slight elevation and to the rear of the car, testified that he actually

---

*A.* His forehead.

*Q.* . . . as it came down? Can you actually see the contact being made?

*A.* I couldn't actually see it but there was nothing left of him elsewhere to hit.

*Q.* Could you hear the blows being struck?

*A.* Yes, you could hear 'em.

\* \* \*

*Q.* Did you see him, when Defendant Budzyn came over and grabbed his hand and started to straddle him, did you see him fighting Defendant Budzyn in the sense of punching him or kicking him or biting him or scratching him or whatever?

*A.* No.

Similarly, Mr. Hollins testified:

*Q.* All right. Now, you initially saw the flashlight hitting him in the hand; is that correct?

*A.* Yes.

*Q.* Could you see where it was hitting him at this point?

*A.* I couldn't see actually where contact was made, no. I just could see that it was—had to be above the shoulders.

\* \* \*

*Q.* . . . given the position that Officer Budzyn was at over Malice Green, what part of him would he have been striking?

*Mr. Goldpaugh:* The question has been asked and answered, your Honor.

*The Court:* I'll take it again.

By Mr. Baker:

*Q.* What part of him would he have been striking given the way they were positioned from what you saw?

*A.* From what I saw it would have to be the head area.

*Q.* Could you hear it?

*A.* Could I hear it?

*Q.* Yes.

*A.* Yes, I could hear it making contact.

saw Budzyn strike Green on the head with the flash-
light several times.[19] Witness Fletcher's testimony,
which did not indicate that Budzyn's blows appeared
to land on Green's head, was not necessarily inconsis-
tent with the conclusion of the other witnesses.
Fletcher explained that he did not see everything that
transpired after observing the blows to Green's hand
and after Budzyn positioned himself further into the
car on top of Green because Officer Budzyn was posi-
tioned in a way that obstructed his view for a
period.[20]

---

[19] Mr. Brown testified as follows:

> Q. Now, what did you see Officer Budzyn do with this flashlight?
> A. Began to strike Malice Green in the head.
> Q. Now, explain, please, were you on a curb?
> A. Yes, I was.
> Q. And were you elevated looking down into the car?
> A. Yes, I was.
> Q. And from where you were standing, how was it that you could see into the car? What part of the car could you see into?
> A. Through the rear window.
> Q. And could you also see into the side passenger door?
> A. Yes, I could.
> Q. Was it open at that time?
> A. Yes, it was.
> Q. How was it that you saw Officer Budzyn striking Malice Green in the head?
> A. Because the interior dome light was on, plus the lighting on the car, on the unmarked car behind it.
> Q. Where was Malice Green's head when you saw him being struck?
> A. In between the seats.
> Q. When you say, in between the seat, you mean between the front passenger's seat and the front driver seat?
> A. From where I was looking, they had like split, the seats, with a gap in between 'em, and that's where his head was.

[20] Relevant portions of Mr. Fletcher's testimony are as follows:

> Q. . . . . He only hits Mr. Green in the hand?

I cannot help but conclude that the evidence concerning Budzyn's actions was overwhelming to support the verdict of second-degree murder. This conclusion would not be different even if, as the majority suggests, the injuries actually causing Green's death could have been inflicted solely by Nevers. While Budzyn's actions were perhaps less brutal than Nevers', he initiated the encounter with Green that

---

*A.* That's all.

*Q.* He never hit him anywhere else, did he?

*A.* I didn't see him hit him anywhere else.

\*    \*    \*

*Q.* Now, you also, in response and I don't remember which attorney it was, to one of the—I think it was Mr. Batchelor, I think, and he was talking about when you could no longer see the hands of Malice Green and see Officer Budzyn was because he had his back to you in the car?

*A.* Yes, ma'am.

*Q.* And when this happened you could not see what was going on inside of the car; is that right?

*A.* Yes, ma'am.

*Q.* So you didn't actually see the strikes hitting his hands at that point, did you?

*A.* No, ma'am.

*Q.* Did you see the flashlight going up at that time?

*A.* No, ma'am. I had backed away then.

*Q.* When your view—I understand that you testified that most of the time you could see his hands, I mean his flashlight actually striking the hands of Malice Green?

*A.* Yeah.

*Q.* When your view was obstructed when you backed up, could you see the exact portion of the body that the flashlight was landing?

*A.* No, ma'am.

*Q.* Could you hear that it was landing on some part of his body?

*A.* Yes, I could.

*Q.* And, again, just so we are all clear that is during the time when your view was obstructed because he was directly in front of you?

*A.* Yes, ma'am.

ultimately resulted in Green's death. His actions went far beyond the level of force necessary in the situation. Rather than calling his partner to assist him in pulling Mr. Green out of the car and handcuffing him, Officer Budzyn exerted excessive force in attempting to get Green to open his clenched fist. Further, Budzyn did not step in to stop Nevers' beating of Green when Nevers continued the beating with actions that were clearly an unjustified and brutal show of force.

The majority attempts to discount the evidence against Budzyn by questioning the credibility of the eyewitnesses. It may or may not be true that because each of these witnesses had been implicated in criminal activity, or because they may have smoked cocaine or consumed alcohol before witnessing the events leading up to Green's death, they were less credible than the EMS witnesses who testified against defendant Nevers. This Court, however, is not in a position to judge the relative credibility of the witnesses against the two officers. The jurors heard the testimony from eyewitnesses Pace, Hollins, Brown, and Fletcher, all of whom were subjected to thorough cross-examination, and evidently found it to be credible.[21]

IV

MEDIA REPORTS

I will next turn my attention to the jurors' exposure to media reports concerning contingency plans in case of postverdict rioting. Defendants argue that exposure to these reports tainted their juries. Only

---

[21] I further note that whether the evidence may also have supported a lesser verdict is not the question before us.

two of the four juror affidavits offered by the defendants mention exposure to this information; one from the Nevers panel and one from the Budzyn panel. The Nevers juror recounted exposure to a news report regarding possible rioting and freeway closings while home overnight during the deliberation period. The Budzyn juror stated that during deliberations someone had mentioned news reports that the city was preparing for possible rioting and that businesses and freeways might be closed if defendants were acquitted.

Initially, we note that, unlike the viewing of *Malcolm X*, exposure to these reports occurred during the deliberation period. Consequently, the timing of this exposure is more troubling because the sanctity of jury deliberations is more directly implicated. However, virtually every other aspect of this particular extraneous influence is less troublesome than the viewing of *Malcolm X*.

In contrast to the affidavit statements regarding the movie, which arguably support a finding of exposure by virtually every juror on both panels, affidavit statements regarding media reports do not indicate this degree of exposure. The Budzyn affidavit is equivocal regarding how many on that panel were exposed. It relates that someone mentioned media reports, but does not indicate how many on the panel heard the comment, or whether only the writer of the affidavit heard it. The affidavit from the Nevers juror attests to that juror's own exposure, but says nothing about whether the juror discussed the reports with other jurors or whether other members of the panel had also heard the reports. From the affidavits, one can only be certain of exposure by one Budzyn juror and

at least two Nevers jurors. Consequently, defendants have not produced sufficient evidence that either panel, in its entirety, was tainted by the reports. While it is not necessary to a finding of prejudice that the entire panel be exposed, the number of jurors exposed to the prejudicial information is relevant to determining the possibility of prejudice. *Watkins, supra.* The lack of proof of extensive juror exposure to these reports weighs against a new trial. See *United States v Ruggiero, supra* (holding that one juror's exposure to extraneous information concerning prior criminal acts of the defendant, which she did not disclose to the other jurors before they rendered a verdict, did not merit a new trial).

Even if defendants had shown extensive juror exposure, I would not conclude that there was a real and substantial possibility that it affected the verdict. Unlike other cases finding taint from exposure to media reports,[22] the information conveyed in these reports did not relate directly to a material aspect of the case. *Caro-Quintero* at 1574. "Reviewing courts will not disturb jury verdicts on appeal when extraneous information relates only to issues not material to the guilt or innocence of the defendant." *United States v Bagnariol,* 665 F2d 877, 887 (CA 9, 1981).

---

[22] An example of such a case is *United States v Bruscino*, 662 F2d 450, 461 (CA 7, 1981), in which a juror read, and cut out, an article reporting a codefendant's guilty plea to a charge of conspiracy. The juror stated that she cut the article out of the paper and took it to court so the other jurors could read it. Because the information contained in the article supported the government's theory concerning the defendant's guilt, exposure to the article mandated a new trial.

Typical news accounts deemed prejudicial are those with "massively inflammatory revelations of prior felony convictions, past criminal conduct[, or] admitted and alleged improprieties . . . ." *United States v Solomon*, 422 F2d 1110, 1118 (CA 7, 1970).

Information in the media reports was not material to the defendants' guilt or innocence.

Further, I cannot reasonably conclude that the jurors would allow fear of potential rioting to sway them to convict. While this is, of course, a possibility, it is not a necessary, or even a reasonable, conclusion. It must be assumed that most, if not all, of the jurors were aware of the Los Angeles rioting occurring after the Rodney King acquittals. Given this reality, exposure to reports that officials were prepared and had contingency plans in place may have had the opposite effect and lessened any pressure to convict. Again, on the basis of the juror affidavits, I am not convinced that fear of rioting had a real and substantial possibility of shaking the jurors' resolve to abide by the judge's instructions that they should decide the case only on the evidence and not let sympathy or prejudice influence their decisions.

Finally, even if the defendants had met their burden of showing that exposure to the media reports reasonably affected the verdict, a new trial would not be warranted because of the overwhelming evidence against the defendants, as explained earlier in this opinion.

V

JUROR DELIBERATIONS INVOLVING STRESS

I disagree with the majority's conclusions regarding the jurors' discussion of the Stop the Robberies Enjoy Safe Streets unit, and of their apparent belief that defendants had been members of that unit. Clearly, as indicated in voir dire questioning of potential jurors, the defendants were aware that STRESS was a potentially inflammatory topic and that the nature and exis-

tence of the unit was common knowledge among
many of the potential jurors. In spite of this, defense
counsel made no effort to deal with the issue at trial
and did not seek any cautionary instructions beyond
the normal instruction given by the trial court that the
jurors should consider only the evidence before them
and that they should view this evidence without
prejudice or sympathy.

The jurors' personal knowledge and life exper-
iences as urban-dwelling Americans probably made
inevitable a discussion of the wider problem of police
brutality and specifically of the notorious STRESS unit.
That their deliberations would include a discussion of
STRESS was, perhaps, to be expected. That they might
speculate and discuss their own knowledge or beliefs
that one or both of the defendants had once been
members of STRESS is also not surprising.

Can it be seriously argued that defendants are com-
promised because the acts of which they stand con-
victed invoked a discussion of the official lawlessness
epitomized by the jurors' apparent understanding of
STRESS? Police brutality was what this trial was about.
Juror discussions about the history of police brutality,
in their own home town, was a natural part of their
deliberative process and should not be relied on by
this Court in support of defendants' claims of error.[23]

### VI

### OTHER ISSUES

While the defendants raise other extraneous influ-
ences that they believe, in combination with the

---

[23] In contrast, the movie *Malcolm X* and the media reports of riot con-
tingency plans were clearly extraneous to the issues in this case.

issues discussed, tainted the jury, I find them to be substantially less troubling than those I have discussed. Further, I am unpersuaded that a combination of factors denied the defendants a fair trial by an impartial jury. A careful review of the record assures that the trial judge generally did an exemplary job of ensuring a fair trial for the defendants. A review of the voir dire transcripts, particularly those portions concerning seated jurors, also assures that the jurors on both panels were unbiased.[24] The defendants have failed to convince me that any extraneous influences rose to a level of prejudice sufficient to taint the jury panels.

---

[24] For example, we note the following statements during voir dire made by some of the seated jurors, detailing their exposure and reactions to media reports:

No, I don't read the newspaper, very seldom, and like I say, a person is innocent until proven guilty. That's my strong belief and I [would] fight for his right to have it so.

\* \* \*

I cannot believe any of it right now because I have not heard— it's like trying to find out the truth to a mathematical equation, okay? I have to actually work through the process in order to get to a conclusion. I cannot just draw an opinion based on someone else's, whatever they, their opinions are. Follow me?

\* \* \*

Well, I read that police brutality killed this man. I don't know if it's true or not because the papers write anything, the news say anything, so it's hard to believe. . . . I didn't pay . . . any attention.

\* \* \*

I was upset, I mean, by a death, I mean sure, but the opinion was more or less neutral, because I didn't know all the elements of the case, so—and if I was in any of those people's position, all I know, I would want a fair trial.

Finally, I have carefully reviewed the defendants' numerous other claims, and find that some are lacking in merit and that others were properly dealt with by the Court of Appeals. Consequently, I will not discuss them further.

VII

CONCLUSION

All citizens must fiercely guard the processes and institutions that ensure our liberty. The chosen occupation of these defendants is one that plays a crucial role in protecting the life and liberty of all citizens. I appreciate the difficulty faced by those who seek to keep the peace on our city streets. I recognize that the great majority of police officers conscientiously perform their duties with the utmost regard for the rights of those they seek to protect. However, when police officers cross over the line from keepers of the peace and protectors of lives to aggressors, exerting force far beyond that required in the given situation, the law must treat them no differently than other defendants.

The right to a fair trial by an impartial jury is of paramount importance in securing our liberty. Consequently, this Court has properly taken very seriously the defendants' claims that their juries' exposure to extraneous influences denied them this right. After careful review however, I am left with the distinct and firm impression that the defendants received a fair trial.[25] The potential prejudice from the asserted influences is real. However, it does not rise to a level

---

[25] While I recognize that the defendants' trial was not perfect, "[w]e require a fair trial, not a perfect trial." *People v Beach*, 429 Mich 450, 491; 418 NW2d 861 (1988).

sufficient to persuade me of a real and substantial possibility that the verdicts were affected. Additionally, given the overwhelming evidence supporting the verdicts, it can be said, beyond a reasonable doubt, that these influences did not contribute to the verdicts.

For all the above reasons, I would affirm the Court of Appeals decision.