*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
November 24, 2025
3:06 PM

Plaintiff-Appellee,

v

No. 363985
Montcalm Circuit Court
LC No. 2021-027646-FC

NICHOLAS GAGE BAUER,

Defendant-Appellant.

Before: RICK, P.J., and MALDONADO and KOROBKIN, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of second-degree murder, MCL 750.317, three counts of assault with intent to commit great bodily harm less than murder (AWIGBH), MCL 750.84, and four counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. We affirm.

## I. BACKGROUND

This appeal stems from a robbery that resulted in a severe gunshot injury to Paige Nicholson and the death of Destini Cunliffe. At the time of the shooting, defendant was 17 years old and lived in his mother's house with a close friend, Nate Crane, who was in his mid-twenties. Defendant's mother had recently moved out to live with her fiancé. In the late afternoon of January 13, 2021, Jack McIlhargey sent some pictures to defendant via Snapchat, offering to sell defendant two guns for $600. Defendant arranged for the sale to take place at his front door. However, Jack did not actually have guns to sell. Instead, he and his friend Dillon intended to rob defendant.[1] Jack texted Paige to ask her to drive them to the robbery. Paige was hanging out with Destini and

---

[1] The prosecutor was not able to locate Dillon, and his identity, including his last name, was unknown at the time of defendant's trial.

two other friends, Kaelan Gutieriez and Janessa Smith. Destini had just gotten a new truck, so she agreed to drive the girls to pick up the boys.

The group then went to Janessa's house to pick up Alex Haas, who was dating Janessa's mother. Alex was approximately ten years older than everyone in the group.[2] He was tall and "[b]uilt bigger," and Jack and Dillon wanted Alex as an extra person to support them during the robbery. When the group arrived at defendant's house, Destini turned the truck around so they could make a quick getaway. Dillon, Jack, and Alex got out and walked up to defendant's door, while all four girls stayed in the truck. Dillon had a gun, and Alex had a rope with a lock on the end. All three boys were wearing medical masks.

Defendant answered the door with a gun, and his friend, Kevin Bartz, watched the doorway from the kitchen with an AR-15 on the table in front of him "[t]o make sure no funny shit happen[ed]." After defendant answered the door, Dillon and defendant argued about what should be handed off first—Dillon's gun or defendant's payment. The two briefly fought over the gun, and then Dillon grabbed defendant's money out of his hand. As the three robbers ran away, they heard "a lot" of gunshots.

The girls in the truck also heard "nonstop" shooting as the boys were running away from the house. The doors to the truck had been left open so the boys could hop in quickly. Paige, whose legs were hanging out of the truck, was shot in the thigh. Destini began to drive away, but was struck by a bullet in the back of the head and slumped over the steering wheel. The boys got into the truck, but Destini fell out of her open door. Alex jumped into the driver's seat, and the group sped away while bullets were still being fired at the truck, leaving Destini behind.

Defendant and another of his friends, Charlie Hammons, went outside to retrieve shell casings. Defendant also handed Charlie a gun and told him to hide it, so Charlie wrapped the gun in a T-shirt and hid it in a mattress in the fire pit in the back yard. Defendant found Destini lying by the road and called an ambulance. Police officers arrived and tried to stabilize her. She was taken away by ambulance but died from a single gunshot wound to the back of her head. As officers secured the scene, they found Alex's lock and rope in a trash receptacle near defendant's property. They also discovered bullet holes in the side of a fence and an unoccupied house across the road, as well as in the side of a car parked nearby. However, police officers did not find any bullet holes or "bullet-type" damage to defendant's house. Officers collected several shell casings from different caliber weapons around the porch and discovered the gun hidden in the fire pit. Inside defendant's house, police officers found several more guns.

Defendant was transported to the police station where he was interviewed. The interview was recorded and played for the jury during the trial. During the interview, defendant initially stated that he had nothing to do with the shooting. However, defendant later confessed that he had arranged to buy two guns but got robbed instead. He also admitted to shooting at the robbers as they were running away, but he claimed that he did so to protect his life. Meanwhile, Alex dropped

---

[2] Alex was 25 to 26 years old at the time of the shooting. Destini had recently turned 18 years old. Jack was 16 years old, and Dillon was under 16 years old. Paige was 15 to 16 years old, Janessa was 17 years old, and Kaelan was 17 or 18 years old.

Paige off at the hospital with Kaelan, dropped the others off at their houses, and then abandoned Destini's truck in a nearby creek after cleaning it with bleach.

Defendant was convicted after a seven-day jury trial. Trial counsel moved in the trial court for a new trial on the basis of prosecutorial misconduct, arguing that the prosecutor impermissibly commented on defendant's Fifth Amendment right to silence, told the jury that the robbers would be charged for their crimes, and did not timely notify defendant that the robbers were given use immunity for their testimonies at trial. The trial court denied the motion. Appellate counsel then moved in the trial court for a new trial or evidentiary hearing regarding the alleged coercion of defendant during his interview with the police, which the trial court also denied. This appeal followed.[3]

## II. ANALYSIS

## A. DEFENDANT'S POLICE INTERVIEW

Defendant first argues that his interview with police was involuntary and that his trial counsel's assistance was ineffective because he failed to move to suppress the interview. We disagree.

Both the United States and Michigan Constitutions protect citizens against self-incrimination. US Const, Ams V and XIV; Const 1963, art 1, § 17. "The use of an involuntary statement elicited by coercive state action in a criminal trial violates these constitutional protections." *People v Stewart*, 512 Mich 472, 480; 999 NW2d 717 (2023). To determine whether a juvenile's confession was voluntarily made, we consider the totality of all the surrounding circumstances, including:

> the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Id*. at 481 (quotation and citation omitted).]

---

[3] Concurrent with his appeal, defendant moved in this Court to remand to the trial court to expand the record, which this Court denied. *People v Bauer*, unpublished order of the Court of Appeals, entered November 8, 2024 (Docket No. 363985). Exactly one year after filing his previous motion, defendant moved in this Court a second time to remand, making the same arguments and providing the same offers of proof. As will be discussed, we deny defendant's second motion to remand.

-3-

In this case, the application of these factors does not support that defendant's statements to the police were involuntary. At the outset of the interview, the officers told defendant that he was not under arrest but that he was "not really free to leave." At that point, the officers read defendant his *Miranda*[4] rights and asked if they made sense, to which defendant responded affirmatively. The officers then asked defendant if he was willing to waive his rights, and he responded, "I suppose so."

Defendant concedes that the 40-minute interview was not excessively long and that the interviewing officers were not physically abusive. In fact, the record supports the opposite. Defendant had access to water throughout the interview, and the officers repeatedly asked him if he was "good," if he was hungry, and if he needed anything. Defendant used the bathroom shortly after the interview ended, and officers brought him a snack, even though he denied being hungry.

Nevertheless, defendant argues that his young age, lack of education and intelligence, possible intoxication, and tiredness render his statements involuntary. We are not persuaded. Recently, in *Stewart*, 512 Mich at 490-493, the Supreme Court gave careful weight to the defendant's age in a case involving the admissibility of an 18-year-old accused's custodial statements. In *Stewart*, the Supreme Court revisited its decision in *People v Parks*, 510 Mich 225, 235; 987 NW2d 161 (2022), in which the Court noted that young offenders are not yet fully developed in their decision-making abilities and are more susceptible to negative outside influences. See *id.* at 490-491. Relying on *Parks*, the *Stewart* Court determined that the young defendant's age weighed in favor of finding his statement to be involuntary because he was living with his family, attending secondary school, and made repeated requests to call his parents. *Id.* at 492. The interviewing officers repeatedly told him to "man up" and "act like a man." *Id.* The Supreme Court concluded that "[d]efendant's age mattered, both in how he perceived and responded to the officers' statements, and in how the officers treated him." *Id.*

In the present case, therefore, the fact that defendant was 17 years old certainly is relevant. However, unlike the defendant in *Stewart*, defendant no longer lived with his parents and did not request to call them during his interview. Nor did the interrogating officers make references to defendant's age or otherwise indicate that defendant's youth was influencing their treatment of him. Accordingly, this case is distinguishable from *Stewart*. Moreover, "a defendant's age alone does not render their statements involuntary"—an accused's age is only one factor to consider. *Id.*

Turning to the other relevant factors, defendant concedes that, despite his young age, he had prior experience with law enforcement, including several arrests. Regarding his intelligence level, defendant was taking ninth-grade classes online and was employed a few months before the shooting, until he quit. Additionally, the record does not support that defendant was in any way impaired during his interview. Although defendant's friends testified that they saw defendant consume marijuana at some point during the night of the robbery, the record does not support that defendant was intoxicated during his interview at noon the next day. The officers asked defendant whether he was under the influence of anything, and he confirmed that he was just tired. The video footage of the interview does not reveal signs of intoxication, nor did the interviewing officers

---

[4] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

note any such signs during their testimonies at trial. Likewise, although defendant told the officers that he was tired, he was allowed to nap in his own blanket before and after the interview. During the interview, he remained alert and responsive.

Finally, defendant argues that the officers used coercive psychological tactics during the interview, including making promises of leniency and misleading defendant to get his consent to search his cell phone. Coercive psychological tactics include express or implied promises of leniency in exchange for cooperation. *Stewart*, 512 Mich at 481-482. However,

> general observations regarding leniency—e.g., that it would be better if the interrogee told the truth, that the interrogee's cooperation will be brought to the attention of officials responsible for charging or sentencing decisions, or that cooperation has been looked upon favorably by those officials in the past—will not render a statement involuntary . . . . [*Id*. at 481.]

We conclude that the statements the officers made in this case are much more similar to general observations about honesty and leniency, including the statements that the officers intended to tell the prosecutor about defendant's honesty, that these situations "come out the best in the end" when someone is completely honest, that honesty "goes a long way," and that honesty "is the only thing that is going to help [defendant] out."

Additionally, the officers' request for defendant's password and consent to search his cell phone do not rise to the type of coercive psychological tactics that render an interview involuntary. Toward the end of the interview—after defendant had described his participation in the shooting—the officers requested permission to search his phone. When defendant asked why, the officers responded that they seize everyone's phones, it is "part of the deal," and they only wanted it to corroborate what he had told them. Defendant then gave the officers his phone and gave them consent to search it. The record does not contain any support that the officers' statements were misleading or coercive. Therefore, based on the totality of the circumstances, defendant's 40-minute interview with police officers was voluntary, not coerced.

Accordingly, then, we are not persuaded that defense counsel provided ineffective assistance for failing to move to suppress the interview. Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). This Court reviews any factual findings for clear error and reviews de novo questions of constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). However, when, as here, the trial court did not hold an evidentiary hearing on this issue, then there are no factual findings to which this Court must defer. *People v Gioglio (On Remand)*, 296 Mich App 12, 20; 815 NW2d 589 (2012). In such cases, we determine whether the defendant received ineffective assistance on the record alone. *Id.* Effective assistance of counsel is presumed and the defendant bears a heavy burden to prove otherwise. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). That is, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy. *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012).

To demonstrate ineffective assistance of counsel, a defendant must first establish that counsel's performance was deficient, which involves showing that, "in light of all the

-5-

circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *People v Leffew*, 508 Mich 625, 637; 975 NW2d 896 (2022) (quotation marks and citation omitted). Defendant must also demonstrate that he was prejudiced by counsel's error(s)—namely, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (quotation marks and citation omitted). "Reasonable probability means a probability sufficient to undermine confidence in the outcome." *Id.* (quotation marks and citation omitted). "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

In this case, we have determined that defendant's statement to the police was voluntary. Therefore, trial counsel's assistance was not ineffective when he failed to file a futile motion to suppress the voluntary interview. See *id*.

### B. EXPERT ON YOUTH BRAIN SCIENCE

Defendant next argues that his trial counsel's assistance was ineffective for failing to call an expert to discuss defendant's age and the effects of an underdeveloped brain on his theory of self-defense. We are not persuaded.

MCR 7.211(C)(1)(a) requires that "[a] motion under this subrule *must* be supported by affidavit or offer of proof regarding the facts to be established at a hearing." [Emphasis added.] Defendant's only offer of proof in support of his motion to remand is a paper by Daniel P. Keating, Ph.D. of the University of Michigan Departments of Psychology, Psychiatry, and Pediatrics. The paper is titled "Summary of Adolescent Developmental and Neurodevelopmental Science in re Juvenile Life Without Parole [LWOP]." However, as the title indicates, the paper deals with the propriety of subjecting adolescents convicted of first-degree murder to LWOP. In the present case, however, defendant's sentence for his second-degree murder conviction was a 15-year minimum sentence, which was below the sentencing guidelines. Dr. Keating's paper does not appear to discuss the elements of self-defense, nor is it readily apparent from the paper how the developments in adolescent brain science it covers would inform or bolster such a defense. Moreover, Dr. Keating's paper is not specific to defendant, nor does the paper present specific facts to be established at an evidentiary hearing. We conclude, therefore, that this offer of proof fails to meet the requirements of MCR 7.211(C)(1)(a).

We also note that defendant's argument for this issue is novel. Defendant's claim of error is based on the Supreme Court's declarations in *Parks*, 510 Mich at 225, regarding the underdevelopment of youthful brains. However, *Parks* was decided in the context of prohibiting the mandatory imposition of LWOP on youth convicted of first-degree murder. Defendants' appellate counsel conceded that there is no caselaw applying *Parks* or its underlying concepts in the context of a juvenile's claim of self-defense. Therefore, we cannot conclude that trial counsel was ineffective for failing to be the first to apply those concepts to a theory of self-defense involving a minor defendant. See *People v Posey*, 512 Mich 317, 342; 1 NW3d 101 (2023) (holding that it is not constitutionally deficient for trial counsel to fail to raise a challenge based on a desired change in the law); *People v Blevins*, 314 Mich App 339, 352; 886 NW2d 456 (2016) (determining that "trial counsel is generally not ineffective for failing to make a novel argument").

-6-

For these reasons, we decline to grant appellate relief on the basis of this alleged error.

## C. JURY SERVICE IN VIOLATION OF MCL 600.1307A

Defendant argues that the trial court violated his right to an impartial jury and MCL 600.1307a(1)(d) when it seated three jurors who had previously served together. Defendant further asserts that this was a structural error, creating a presumption of prejudice. We disagree with both contentions.

### 1. STANDARDS OF REVIEW

Defendant concedes that he did not object in the trial court to his impaneled jury but instead raised this issue for the first time in this Court. Therefore, this issue is unpreserved for appellate review. We review unpreserved errors, including structural errors, for plain error affecting substantial rights. *People v King*, 512 Mich 1, 10; 999 NW2d 670 (2023). To avoid forfeiture under the plain-error rule, a defendant must show that an error occurred; that the error was plain—that is, clear or obvious; and that the plain error affected his or her substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). The third prong requires defendant to show that the error affected the outcome of the lower court proceedings. *Id*. However, when an error is structural, the existence of the error alone satisfies the third prong of the plain-error standard, and a defendant need not also establish outcome-determinative prejudice. *People v Davis*, 509 Mich 52, 74; 983 NW2d 325 (2022). Rather, in cases of structural error, the burden shifts "to the prosecutor to demonstrate that the error did not seriously affect the fairness, integrity, or public reputation of the judicial proceeding." *King*, 512 Mich at 10 (quotation marks and citation omitted).

### 2. JUROR QUALIFICATIONS

Jurors are presumed to be qualified, and the burden of proving the existence of a disqualification is on the party alleging disqualification. *People v Collins,* 166 Mich 4, 9; 131 NW 78 (1911); *People v Johnson*, 245 Mich App 243, 256; 631 NW2d 1 (2001). Voir dire is the process for probing potential disqualifications. *People v Harrell,* 398 Mich 384, 388; 247 NW2d 829 (1976). And MCR 2.511(E)(1) permits a party to challenge a prospective juror for cause if the party discovers a juror is not qualified. MCL 600.1307a(1)(d) addresses specific juror qualifications and states in pertinent part that "[t]o qualify as a juror, an individual must . . . [n]ot have served as a petit or grand juror in a court of record during the preceding 12 months." The caselaw on this particular disqualification is scant. However, the Supreme Court interpreted a similar, predecessor provision as addressing the "evil" of "professional" jurors who, "from a disinclination to steady employment, and sometimes from more reprehensible motives," succeed in being summoned for jury duty. *Burden v People*, 26 Mich 162, 164 (1872).

In this case, defendant's jury voir dire took place on April 19, 2022, with defendant's trial scheduled for May 2, 2022. After the close of voir dire, one of the seated jurors for defendant's trial, indicated that he *also* had been selected to serve at a *different* trial scheduled to begin on May 10, 2022. The juror's statement about his scheduled *subsequent* jury service indicates that the Montcalm County jury selection process allows that jurors might serve on multiple juries within 12 months, in clear violation of MCL 600.1307a(1)(d). Defendant submitted an affidavit on appeal

in which an investigator from the State Appellate Defender's Office (SADO) averred that three jurors did, in fact, serve on the same jury at a different trial before defendant's trial—potentially within the preceding three months. Assuming arguendo that three of defendant's jurors were not qualified to serve pursuant to MCL 600.1307a(1)(d) because of their recent prior jury service, we nevertheless conclude that defendant has not established that he is entitled to a new trial.

### 3. STRUCTURAL ERROR AND COMPLIANCE WITH MCL 600.1354(1)

Defendant argues that when the Revised Judicature Act (Act), MCL 600.1300 *et seq*., has been violated, such an error is structural and requires a new trial, even if the violation is merely ministerial. We disagree.

When an unqualified juror serves in violation of MCL 600.1307a, section 1354(1) of the Act dictates that a new trial is necessary only when the defendant can make the three following showings:

> Failure to comply with the provisions of this chapter shall not be grounds for a continuance nor shall it affect the validity of a jury verdict [1] unless the party requesting the continuance or claiming invalidity has *made a timely objection* and [2] unless the party *demonstrates actual prejudice* to his cause and [3] unless the *noncompliance is substantial*. An objection made at the day of a scheduled trial shall not be considered timely unless the objection, with the exercise of reasonable diligence, could not have been made at an earlier time. [Emphasis added.]

Defendant's claim for a new trial certainly fails the first requirement of MCL 600.1354(1) because he did not make a timely objection. A juror announced his back-to-back jury service at the close of voir dire, nearly two weeks before defendant's jury was empaneled and his trial began. Although defendant had the opportunity, with the exercise of reasonable diligence, to object, he did not raise the issue of possible juror disqualification at any time in the trial court.

The second requirement of MCL 600.1354(1) is more complex. As noted, defendant argues that the presence of three unqualified jurors on his jury constitutes a *structural* error. It is his position, then, that he does not need to establish actual prejudice to his cause because prejudice is presumed for unpreserved structural errors. See *Davis*, 509 Mich at 75. "The defining feature of a structural error is that it affects the framework within which the trial proceeds, rather than being simply an error in the trial process itself." *King*, 512 Mich at 10 n 5 (quotation marks, citation, and brackets omitted). "The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial." *Id*.

We are not aware of any case in which the seating of an unqualified juror was characterized as a structural error. To the contrary, in *People v Miller*, 482 Mich 540, 556; 759 NW2d 850 (2008), our Supreme Court addressed the service of a juror who was disqualified under MCL 600.1307a(1)(e) because he had been convicted of a felony. The juror failed to disclose a prior felony conviction on his juror questionnaire, so neither party nor the trial court knew that the juror was unqualified to serve. *Miller*, 482 Mich at 543. The Supreme Court readily acknowledged that the juror's presence on the jury violated MCL 600.1307a(1)(e). *Id*. at 546. However, the

*Miller* Court determined that the error was not structural because no fundamental constitutional right was implicated. *Id*. at 556. The Supreme Court noted that a criminal defendant has a constitutional right to be tried by an impartial jury, but "there is no constitutional right to have a jury free of convicted felons." *Id*. Accordingly, the juror qualification error was not structural, and the defendant was required under MCL 600.1354(1) to demonstrate that the juror's presence on the jury actually prejudiced the defendant's cause. *Id*. at 548.

Likewise, the present case involves no constitutional error. A criminal defendant does not have a constitutional right to be tried by a jury without any jurors who have previously served within the preceding 12 months. As noted, that right is conferred by statute. See MCL 600.1307a. Therefore, the fact that an unqualified juror served on defendant's jury did not constitute a structural error. See *Miller*, 482 Mich at 556.

Defendant's reliance on *People v Yarbrough*, 511 Mich 252, 262; 999 NW2d 372 (2023), does not compel a different conclusion, because that case does not apply to this one. In *Yarbrough*, the Supreme Court determined that the trial court's refusal to allow ongoing peremptory challenges violated MCR 2.511(G),[5] which the Supreme Court characterized as a structural error. *Id*. at 260, 270-271. The Court explained that the application of the harmless-error standard in the context of peremptory challenges was unworkable because of the difficulty, or impossibility, of determining prejudice in such instances. *Id.* at 270. Therefore, when preserved and not immediately cured, the erroneous denial of a defendant's peremptory challenges constitutes a structural error that warrants automatic reversal. *Id.* at 270-272. Importantly, the Supreme Court distinguished between that particular error and a hypothetical challenge to a juror for cause, as occurred in *Miller* and the present case. See *id*. at 265 n 2. Consequently, *Yarbrough* does not apply here. Rather, pursuant to *Miller*, 482 Mich at 548, we determine that the alleged error is not structural, and defendant must demonstrate actual prejudice to his cause. See MCL 600.1354(1); *Carines*, 460 Mich at 763.

Turning to that analysis, jurors are presumed to be impartial until the contrary is shown. *Miller*, 482 Mich at 550. "The burden is on the defendant to establish that the juror was not impartial or at least that the juror's impartiality is in reasonable doubt." *Id*. "A juror's failure to disclose bias is prejudicial only if it denied the defendant an impartial jury." *Id*. at 548-549.

At the commencement of voir dire, the trial court instructed the jury pool that "[j]urors must be as free as humanly possible from bias, prejudice, or sympathy for either side" and that the purpose of voir dire is to "find out if you have any opinions or personal experiences that might influence you." During voir dire, a prospective juror announced that he had previously served on a jury "weeks ago" in which no verdict was reached. If true, the prospective juror's prior service within weeks of defendant's voir dire disqualified him from serving on defendant's jury. See MCL 600.1307a(1)(d). Moreover, the prospective juror stated that he was "very disappointed" by his

---

[5] Although the substance of this provision has since been moved to MCR 2.511(H), the language remains the same: "After jurors have been seated in the jurors' box and a challenge for cause is sustained or a peremptory challenge or challenges are exercised, another juror or other jurors may be selected and examined. Such jurors are subject to challenge as are previously seated jurors."

prior service and did not believe that he would make a good juror. In that way, he demonstrated bias and was therefore excused.

Later, the seated juror who claimed he was scheduled to serve on *another* jury was brought into the jury box. He confirmed that he had heard all prior questions and that there was no information that he needed to bring to the court's attention. He further confirmed that he could be a fair and impartial juror. If he was biased by prior jury service—or by anything—he had the opportunity to say so. Indeed, all prospective jurors were asked whether they could be fair and impartial and whether there was anything that the court or parties should be aware of. No one other than the prospective juror who was excused expressed bias related to prior jury service.

After the start of the trial, the jurors swore an oath "to justly decide" the questions in front of them. At the close of the trial, the court directed the jurors "to return a true and just verdict" without the influence of "sympathy, bias, or prejudice," and to make their decision on the basis of only properly admitted evidence. Jurors are presumed to follow the trial court's instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). There is no evidence in the present case that any jurors acted in any manner other than how they were instructed. Accordingly, the record does not support that the presence of three jurors who were unqualified under MCL 600.1307a(1)(d) created actual prejudice to defendant's cause.

Nor does the SADO affidavit proffered on appeal demonstrate actual prejudice. The general rule is that a party may not impeach a jury verdict through the use of subsequent juror affidavits regarding what occurred in the jury room. *People v Budzyn*, 456 Mich 77, 91; 566 NW2d 229 (1997). This rule also applies when the affidavit is submitted by a nonjuror and is based on hearsay. *Shiner v Detroit*, 150 Mich App 420, 425; 387 NW2d 872 (1986).[6] "Rather, oral testimony or affidavits may only be received on extraneous or outside errors, such as undue influence by outside parties." *Budzyn*, 456 Mich at 91. See also MRE 606(b) (prohibiting a juror from testifying or submitting an affidavit about any statement made during jury deliberations, unless the juror is testifying about extraneous prejudicial information, an outside influence on the jury, or a mistake on the verdict form).

Accordingly, the SADO affidavit is of little use to establish internal (rather than extraneous) prejudicial information, such as personal biases held or expressed by any jurors on the basis of prior jury service. Ultimately, defendant has not demonstrated actual prejudice to his cause, such that the presence of three unqualified jurors on his jury requires reversal under MCL 600.1354(1). Because defendant has not demonstrated prejudice, defendant also has failed to establish that any such error was outcome-determinative under *Carines*.

---

[6] "Published opinions of this Court that were issued before November 1, 1990, are not binding, but they may be considered for their persuasive value." *People v Urbanski*, 348 Mich App 90, 110 n 5; 17 NW3d 430 (2023), citing MCR 7.215(J)(1).

## D. EXTRANEOUS JURY INFLUENCES

Defendant argues that the trial court erred by denying his motion for a new trial when his jury was exposed to three extraneous influences that denied him the constitutional right to an impartial jury. First, spectators wore T-shirts on the first day of trial demanding justice for the decedent (#justicefordestini). Second, one of defendant's supporters, Nicholas Parcher, made comments during a witness's testimony that caused jurors to complain. And third, one juror believed that her car was damaged in the courthouse parking lot and that she had been followed home. Defendant argues that trial counsel was ineffective for failing to object to these three influences on constitutional grounds. We disagree.

## 1. STANDARDS OF REVIEW AND LEGAL FRAMEWORK

This Court reviews a trial court's decision whether to grant or deny a motion for a new trial for an abuse of discretion. *People v Hurley*, 513 Mich 1097, 1099; 6 NW3d 66 (2024). Likewise, this Court reviews a trial court's decision not to excuse a juror for an abuse of discretion. *People v Caddell*, 332 Mich App 27, 40-41; 955 NW2d 488 (2020). See also MCL 768.18 ("Should any condition arise during the trial of the cause which in the opinion of the trial court justifies the excusal of any of the jurors so impaneled from further service, he may do so and the trial shall proceed, unless the number of jurors be reduced to less than 12.").

Defendant argues that trial counsel did not object to any of the three extraneous influences on constitutional grounds. Unpreserved claims of constitutional error are reviewed for plain error affecting substantial rights. *People v Odom*, 276 Mich App 407, 421; 740 NW2d 557 (2007). As noted, to avoid forfeiture under the plain-error rule, a defendant must show that error occurred; that the error was plain—that is, clear or obvious; and that the plain error affected his substantial rights. *Carines*, 460 Mich at 763. A defendant also must show that the error affected the outcome of the lower court proceedings. *Id*. Regarding defendant's claim of ineffective assistance of counsel, we review de novo whether a particular act or omission fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant. *Gioglio (On Remand)*, 296 Mich App at 19-20.

As discussed, a criminal defendant has a constitutional right to be tried by an impartial jury. *Miller*, 482 Mich at 556. An impartial jury is one that begins the trial with an unbiased frame of mind, is influenced only by legal and competent evidence presented during the trial, and bases its verdict solely on the evidence connecting the defendant to the crime charged. *People v DeHaven*, 321 Mich 327, 334; 32 NW2d 468 (1948); *People v Pribble*, 72 Mich App 219, 225; 249 NW2d 363 (1976). Therefore, when a jury is influenced by extraneous facts, that error may require reversal. *Budzyn*, 456 Mich at 88-89. To make such a showing, the defendant must prove that the jury was exposed to extraneous influences and that these extraneous influences created a real and substantial possibility that they could have affected the jury's verdict. *Id*. If the defendant establishes this initial burden, the burden shifts to the prosecution to demonstrate that the error was harmless beyond a reasonable doubt. *Id*. at 89

In this case, all three instances of conduct were extraneous influences to which the jury was exposed. See *Budzyn*, 456 Mich at 88-89. Nevertheless, we conclude that none of these extraneous influences created a real and substantial possibility that they could have affected the

-11-

jury's verdict. See *id*. And even so, the record supports that these influences were harmless beyond a reasonable doubt. See *id*.

## 2. SPECTATOR T-SHIRTS

At the end of the first day of trial, outside of the presence of the jury, the trial court announced that it noticed some spectators who were wearing T-shirts bearing the message #justicefordestini. The trial court addressed the spectators directly, explaining:

> [W]hile I certainly respect your freedom of speech and your First Amendment right, I am concerned that that could, potentially, be an appellate issue.
>
> There is case law that indicates that even buttons, smaller buttons, can create concern. So moving forward, I would ask that you not have anything visible of that nature, because there is a concern that that would put undue pressure on our jury.

The trial court explained that it relied on two cases to prohibit the shirts, *People v McAlister*, 203 Mich App 495; 513 NW2d 431 (1994)[7] and *People v King*, 215 Mich App 301, 303; 544 NW2d 765 (1996). In *McAlister*, this Court held that a trial court's ruling on a motion for a mistrial "must be so grossly in error as to deprive a defendant of a fair trial or to amount to a miscarriage of justice." 203 Mich App at 503. In *King*, this Court determined that the trial court's denial of a mistrial did not meet that standard when spectators wore three-inch buttons depicting the victim during at least one day of the trial. 215 Mich App at 305. Additionally, the Court declined to find that the buttons were equivalent to communication with the jury or that they could have influenced the jury. *Id*.

In this case, the record does not indicate that any of the jurors saw the T-shirts. Additionally, as will be discussed, when the jurors were questioned later under oath, none of the jurors mentioned seeing the T-shirts or that the shirts had any impact on their impartiality. To the contrary, the jurors affirmed their ability to be impartial. Thus, defendant has not established that this extraneous influence created a real and substantial possibility that it could have affected the jury's verdict and declining to declare a mistrial does not rise to the level of "so grossly in error as to deprive [defendant] of a fair trial or to amount to a miscarriage of justice." *McAlister*, 203 Mich App at 503. Accordingly, the record supports that the trial court did not abuse its discretion when it continued the trial after admonishing the spectators, nor did the trial court abuse its discretion when it denied defendant's motion for a mistrial.

---

[7] This Court recognized the abrogation of *McAlister* on other grounds in *People v Kelly*, 213 Mich App 8, 13; 539 NW2d 538 (1995).

### 3. PARCHER'S CONDUCT DURING A WITNESS'S TESTIMONY

During a break on the fourth day of the trial, the bailiff notified the trial court that some jurors expressed some concerns about Parcher making rude comments from the spectator gallery during a witness's testimony. The trial court questioned Parcher, and he stated that a juror was his neighbor. The trial court instructed Parcher "to be respectful of this Court and anybody in it." Following the trial court's admonition, Parcher voluntarily left the courtroom.

Defense counsel made two requests of the trial court: to excuse the juror in question from the jury and to exclude Parcher from the courtroom and courthouse grounds. The trial court agreed to defense counsel's request regarding Parcher and decided to voir dire the juror. The juror testified that he had "no idea who [Parcher] is" and "never seen him before this." The juror confirmed that Parcher was not his neighbor, that the juror would "not hold this against either side in this proceeding," and that he "definitely" could "continue to be fair and impartial." The trial court found that the juror "appears to legitimately believe he can be fair and impartial" and declined to excuse him.

Later, the trial court conducted voir dire of the rest of the jurors. Several jurors testified that they noticed Parcher's conduct and described it as disrespectful and distracting. However, each of those jurors testified that they would not hold Parcher's conduct against defendant and that they could remain impartial. The "presumption is that they are honoring their oath and are being truthful." *People v DeLisle*, 202 Mich App 658, 663; 509 NW2d 885 (1993). The record thus reflects that any disruption caused by Parcher's conduct did not create a real and substantial possibility that could have affected the jury's verdict. And even if Parcher's conduct could have affected the jury, the jurors' testimonies established beyond a reasonable doubt that Parcher's conduct ultimately was harmless. Thus, the trial court's decision to deny defendant's motion for a mistrial was not "so grossly in error as to deprive [defendant] of a fair trial or to amount to a miscarriage of justice." *McAlister*, 203 Mich App at 495.

### 4. FIGHT IN THE PARKING LOT

The final incident was a fight in the courthouse parking lot after the fourth day of trial. Although not part of the record, an affidavit from Natalie Parcher provides the basic details of the fight. Natalie averred that Nicholas Parcher is her brother and that she was comforting him after he had been prohibited from entering defendant's courtroom. Parcher appeared ready to fight the boyfriend of one of the prosecutor's witnesses, but Parcher was quickly placed in handcuffs. At that time, Natalie began to fight with the witness and the witness's family members. The fight lasted no more than two minutes and was quickly broken up by deputies.

Prior to the start of the fifth day of defendant's trial, the trial court summed up the events:

[I]t was brought to my attention this morning that in the scuffle in the parking lot yesterday that apparently one of our juror's cars was damaged, and she is also concerned about what may have happened after that.

So I think it is important—I do intend to excuse her, but in the interest of ensuring that we have a complete record, we will have her come in and testify as to what has transpired and what her concerns are.

The juror in question testified that she discovered her car was damaged while driving home from court. She did not know what caused the damage, but a police officer confirmed that the damage was from the fight in the parking lot.

The juror further testified that a vehicle followed her on her drive home from court with its lights off, even though it was getting dark outside. When she turned onto her road, the car "continued going" but she saw it pass her house later that evening. Although the juror initially testified that the incident had nothing to do with the trial, she later confirmed that she thought that the person was following her because she was a juror. She also confirmed that the incident upset her and impacted her ability to be fair and impartial.

The trial court excused the juror from further jury service and then brought in the jury and explained:

> [T]here's a matter that has come up that I'm going to need to talk with each one of you individually. . . . I know that this is difficult, but I'm gonna ask that you not discuss what you say . . . in the courtroom to me . . . among yourselves.
>
> It's extremely important that—for both sides to get a fair trial that this case is only discussed with you as a jury when you're charged to do so.

Following that clarification, the trial court questioned each remaining juror individually under oath about the excused juror's concerns. Only one of the jurors seemed aware of the fight in the parking lot, although many jurors knew that the excused juror had said that her car had been damaged at the courthouse and that she might have been followed home. None of the jurors had concerns about the incident that the excused juror described, and none felt scared or threatened. To the extent that two jurors expressed some level of concern over using the same entrance as the trial spectators, the trial court ordered that the jurors would use a separate parking lot and court entrance for the remainder of the trial.

Therefore, defendant has not established that the fight in the parking lot created a real and substantial possibility of affecting the jury's verdict. And even if so, the jurors' testimony during voir dire established beyond a reasonable doubt that the jurors remained impartial. Therefore, the trial court's decision to deny defendant's motion for a mistrial was not "so grossly in error as to deprive [defendant] of a fair trial or to amount to a miscarriage of justice." *McAlister*, 203 Mich App at 495.

## E. JURY INSTRUCTIONS

Defendant argues that the trial court erred when it instructed the jury regarding transferred intent and neglected to instruct the jury regarding transferred self-defense. Additionally, defendant asserts that his trial counsel was ineffective for failing to address the latter instructional error. We disagree.

Generally, "[c]laims of instructional error are reviewed de novo." *People v Montague*, 338 Mich App 29, 37; 979 NW2d 406 (2021). However, unpreserved issues regarding jury instructions are reviewed for plain error affecting a party's substantial rights. *People v Everett*, 318 Mich App

-14-

511, 526; 899 NW2d 94 (2017). "Challenges to jury instructions are considered in their entirety to determine whether the trial court committed error requiring reversal." *People v Eisen*, 296 Mich App 330, 329; 820 NW2d 229 (2012) (quotation marks and citation and omitted). "[A]n imperfect instruction is not grounds for setting aside a conviction if the instruction fairly presented the issues to be tried and adequately protected the defendant's rights." *People v Kowalski*, 489 Mich 488, 503-504; 803 NW2d 200 (2011).

Under the doctrine of transferred intent, if the evidence shows that a defendant intended to kill one person but accidentally killed another, the defendant's intent to kill transfers from the intended victim to the actual victim, and the defendant may be guilty of murder of the actual victim. *People v Youngblood*, 165 Mich App 381, 388; 418 NW2d 472 (1988). Along the same lines, the Supreme Court has determined that the act of shooting into a crowd with the intent to harm *anyone* in the crowd is sufficient to establish the intent to do great bodily harm even when no intended victim was specifically identified. *People v Raher*, 92 Mich 165, 166; 52 NW 625 (1892).

In this case, defendant claims it was an error for the jury to receive an instruction about the transfer of intent regarding his crimes against Paige and Destini because the prosecutor did not also charge defendant with those same crimes against Jack, Dillon, or Alex. However, the transferred-intent doctrine does not require a defendant's intent to be directed at a specific person. *People v Lovett*, 90 Mich App 169, 172; 283 NW2d 357 (1979). To the contrary, it is sufficient that a defendant possesses the requisite state of mind to commit the crime. *Id*. In other words, a defendant may have the intent for a charged offense without directing the intent at any particular victim. *People v Abraham*, 234 Mich App 640, 658; 599 NW2d 736 (1999).

Moreover, we are not aware of any precedent that requires the prosecutor to charge the defendant with a crime related to the *intended* victim, in addition to charging a crime related to the *actual* victim. Therefore, the trial court did not err when it determined that the transferred intent instruction was appropriate, and we conclude that such an instruction "fairly presented the issues to be tried and adequately protected the defendant's rights." See *Kowalski*, 489 Mich at 501-502.

Defendant also was not entitled to an instruction regarding the killing or battering of innocent bystanders when undertaking justifiable self-defense, so his counsel was not ineffective for failing to request such an instruction.

"The unintended killing of an innocent bystander is not murder if justifiably committed in proper self-defense. It may, however, be manslaughter." *People v Jackson*, 390 Mich 621, 624; 212 NW2d 918 (1973). In this case, though, Paige and Destini were not innocent bystanders. The record supports that both girls were helping and encouraging boys in the robbery. Paige testified that she knew that Jack and Dillon planned to rob defendant and confirmed that Destini was "complicit" and agreed to drive them. Therefore, defendant was not entitled to an instruction regarding the effect of his self-defense actions on innocent bystanders. Consequently, defense counsel's failure to advance a meritless argument or raise a futile objection did not constitute ineffective assistance of counsel. See *Ericksen*, 288 Mich App at 201.

## F. CUMULATIVE ERRORS

Defendant's final claim is that the cumulative effect of the errors in this case denied him a fair trial and rendered the resulting conviction unreliable. We disagree.

We review a cumulative-error argument by examining the actual errors identified on appeal to determine whether the errors cumulatively deprived defendant of a fair trial. See *LeBlanc*, 465 Mich at 591 n 12. A new trial is warranted when the cumulative effect of the actual errors undermines confidence in the reliability of the verdict. See *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007). The errors "must be of consequence" and must "have been seriously prejudicial in order to warrant a finding that defendant was denied a fair trial." *People v Knapp*, 244 Mich App 361, 388; 624 NW2d 227 (2001).

Our review of the record and appellate arguments leads us to accept that two potential errors occurred. First, defendant's jury may have included three members who were unqualified to serve on the basis of recent prior service. Second, some members of the jury were exposed to extraneous influences, including Parcher's behavior in the courtroom and the fight in the parking lot. However, the combined effect of these errors did not result in substantial prejudice to defendant. The jurors each testified that they were impartial; additionally, the trial court instructed the jury "to return a true and just verdict" without the influence of "sympathy, bias, or prejudice," and to make their decision on the basis of only properly admitted evidence. Jurors are presumed to follow the trial court's instructions. *Graves*, 458 Mich at 486.

Moreover, the jury was presented with substantial evidence of defendant's guilt. Defendant's theory at his trial was self-defense. However, defendant admitted during his police interview that he fired his gun at the robbers and their truck while they were running away—and then driving away. In addition, the jury was presented with Snapchat messages from defendant to Jack supporting that defendant was angry during the shooting, not scared.[8]

Accordingly, the cumulative effect of the two potential errors did not significantly prejudice defendant or undermine confidence in the reliability of the jury's verdict. See *Dobek*, 274 Mich App at 106.

---

[8] On appeal, defendant did not contest the introduction of the Snapchat messages at trial.

## III. CONCLUSION

Defendant has not established any errors requiring reversal.  Accordingly, we affirm his convictions.  Additionally, for the reasons stated herein, defendant has failed to persuade the Court of the necessity of a remand.  We therefore also deny his second motion to remand.

Affirmed.

/s/ Michelle M. Rick
/s/ Allie Greenleaf Maldonado
/s/ Daniel S. Korobkin